CLARENCE H. VENNER, Appellant, *vs.* THE CHICAGO CITY
RAILWAY COMPANY *et al.* Appellees.

*Opinion filed October 26, 1908—Rehearing denied Dec. 2, 1908.*

1. MUNICIPAL CORPORATIONS—*an ordinance granting street priv-ileges expires when municipal corporation ceases to exist.* An ordi-nance granting street privileges to a public service corporation for a period unlimited does not create perpetual rights, but such privi-leges will terminate when the municipal corporation which granted them ceases to exist.

2. SAME—*Chicago ordinance of February 11, 1907, relating to Chicago City Railway Company, is not ultra vires.* The ordinance of February 11, 1907, embodying the agreement between the city of Chicago and the Chicago City Railway Company with reference to the occupation by the company of the city's streets and the re-building of the company's lines of railway, is not *ultra vires* either the city or the street railway company but is a valid ordinance, binding upon the city, the company and the latter's stockholders.

3. SAME—*acceptance of ordinance by directors of Chicago City Railway Company is binding upon stockholders.* Under section 4 of the act of 1859, incorporating the Chicago City Railway Com-pany, which vests all of the corporate powers in the board of directors, an acceptance by the board of directors of an ordinance which the city of Chicago has power to pass and the Chicago City Railway Company has power to accept, binds the stockholders.

4. SAME—*when consent of owners of abutting property is not necessary.* Under the act of 1903 the consent of owners of prop-erty abutting upon a public street to the laying of street railway tracks is not necessary to a grant of the use of such streets for street railway purposes to a corporation whose tracks are already located in such streets at the time of making the grant.

5. SAME—*the ordinance of February 11, 1907, does not create a partnership.* The Chicago ordinance of February 11, 1907, does not, by providing for the division between the city of Chicago and the Chicago City Railway Company of the net profits arising from the operation of the street railway system, create a partnership be-tween the city and the company in the street railway business.

6. SAME—*ordinance of February 11, 1907, has not taken control of railway from board of directors.* The provision of the Chicago ordinance of February 11, 1907, for the appointment of a board of engineers to supervise the re-building of the Chicago City Railway Company, does not take from the board of directors of the Chicago City Railway Company the control of the railway system.

7. CORPORATIONS—*when minority stockholder cannot maintain a bill.* In the absence of a provision in the charter of a corporation to the contrary, a minority stockholder cannot maintain a bill in equity to set aside a transaction which was within the power of the corporation and authorized by a majority of stockholders.

8. LACHES—*minority stockholder must act promptly in asking relief.* One who becomes a stockholder in a street railway company when the latter is in controversy with the city over its rights and who desires to prevent the acceptance by the company of an ordinance consummating a settlement of the controversy should act promptly upon the passage of the ordinance, and not wait until a time when the city, the company and the bondholders under the ordinance cannot be placed *in statu quo* without great loss to them.

APPEAL from the Superior Court of Cook county; the Hon. FARLIN Q. BALL, Judge, presiding.

This was a bill in chancery filed in the superior court of Cook county by Clarence H. Venner, appellant, against the Chicago City Railway Company, its president and secretary and board of directors; J. P. Morgan & Co. and others, the majority stockholders of the Chicago City Railway Company; the First Trust and Savings Bank, trustee under a first mortgage executed to said trustee by the Chicago City Railway Company, dated July 1, 1907, given to secure an issue of bonds by the Chicago City Railway Company to the amount of $10,000,000, and the unknown owners of said bonds; the Harris Trust and Savings Bank, sales agent of said bonds on behalf of the Chicago City Railway Company; the city of Chicago; Fred A. Busse, mayor of the city of Chicago; Bion J. Arnold, A. B. Fleming and C. V. Weston, the board of supervising engineers created and appointed under the provisions of the ordinance of the city of Chicago hereinafter referred to as the ordinance of February 11, 1907, appellees.

The bill was filed by the complainant as a stockholder of the Chicago City Railway Company, on his own behalf and on behalf of all other stockholders similarly situated who desired to join in the suit, and its objects were to set aside

an ordinance of the city of Chicago which was passed by the city council of said city on February 11, 1907, entitled "An ordinance authorizing the Chicago City Railway Company to construct, maintain and operate a system of street railways in streets and public ways of the city of Chicago;" to cancel a mortgage to the First Trust and Savings Bank, trustee, and $10,000,000 in bonds, executed by the Chicago City Railway Company, bearing date July 1, 1907, for the purpose of obtaining funds to carry into effect the provisions of said ordinance of February 11, 1907; for an accounting and for an injunction, for the appointment of a receiver, and for other relief. The defendants to the bill who appeared, filed general and special demurrers, the ground of the special demurrer being that the bill was multifarious, which demurrers were sustained to the bill. Thereupon the complainant asked leave to amend his bill and to file a supplemental bill, and leave having been denied to file such amendment and supplemental bill, the bill was dismissed for want of equity, and the complainant has prosecuted an appeal to this court.

The bill alleges the Chicago City Railway Company is a corporation; that its capital stock consists of 180,000 shares of stock, of the par value of $100 per share; that the complainant is the owner of 200 shares of the capital stock of said Chicago City Railway Company, which he acquired in the year 1905; that on August 15, 1858, the city council of the city of Chicago passed an ordinance granting to Henry Fuller, Franklin Parmalee and Liberty Bigelow authority to construct and operate a horse railway, with single or double tracks, and all necessary and convenient tracks for turn-outs, side-tracks and switches, in and along certain streets in the city of Chicago, which grant was for twenty-five years and until the city of Chicago should elect to purchase said tracks and property from the Chicago City Railway Company; that on February 14, 1859, the General Assembly of the State of Illinois passed an act con-

firming said ordinance and incorporating the Chicago City Railway Company, which act was entitled "An act to promote the construction of horse railways in the city of Chicago;" that on May 23, 1859, the city council of the city of Chicago passed an ordinance authorizing the Chicago City Railway Company to extend its tracks upon certain streets in the city of Chicago, which ordinance was accepted by the Chicago City Railway Company; that all rights and privileges theretofore granted by the city to Parmalee and his associates were by said ordinance confirmed in the Chicago City Railway Company; that on February 6, 1865, the General Assembly of the State of Illinois passed a statute amending the act of February 14, 1859, hereinbefore referred to, whereby the corporate life of the Chicago City Railway Company was extended for the term of ninety-nine years from February 14, 1859. The bill then sets out, by averment and as exhibits, some ninety ordinances passed by the corporate authorities of the city of Chicago or the corporate authorities of the village of Hyde Park or the corporate authorities of the town of Lake prior to the annexation to the city of Chicago of said village of Hyde Park and the town of Lake, whereby the rights of the Chicago City Railway Company to construct and operate street railroads in the portions of the city covered by the provisions of the ordinance of February 11, 1907, were claimed to be either directly or remotely affected. It was averred in said bill that on February 11, 1907, and at the date of the passage of the ordinance sought to be annulled, by virtue of said ordinances said Chicago City Railway Company had certain vested rights in the streets of the city of Chicago upon the south side of the said city, which could not be impaired, extinguished or acquired by the city of Chicago otherwise than under the provisions of the ordinance of August 15, 1858, hereinbefore referred to, which provided that the Chicago City Railway Company should have the right to use and occupy the streets mentioned in

said ordinance for street railway purposes for twenty-five years, and until the city of Chicago should acquire the rights of said Chicago City Railway Company, by purchase, in and to its railroads located in said streets, and averred that the ordinance of February 11, 1907, which is by averment and as an exhibit made a part of said bill, impaired the obligations of the contract created between the city of Chicago and the Chicago City Railway Company and the complainant, as one of the stockholders of the Chicago City Railway Company, by the ordinance of August 15, 1858, and that said ordinance of February 11, 1907, was therefore *ultra vires* and void.

The ordinance of February 11, 1907, covers over one hundred pages of the printed abstract, and it is not, therefore, practicable, within the scope of this opinion, to set its provisions out *in hæc verba* or to incorporate therein an analysis of its several sections. Suffice it to say, that the general scope and object of said ordinance may briefly be expressed as an agreement between the city of Chicago and the Chicago City Railway Company, whereby the Chicago City Railway Company agrees to surrender to the city of Chicago all its rights, whatever they may be, in the streets of said city, and in lieu thereof to accept from the city said ordinance, which grants it the right to operate its street railways in said streets of the city for the period of twenty years, with an agreement on the part of the Chicago City Railway Company to reconstruct and rehabilitate its street car system as operated upon the south side of the city of Chicago, under the direction of the board of supervising engineers created by said ordinance, which is to consist of three members, one to be selected by the city of Chicago, one by the Chicago City Railway Company, and Bion J. Arnold, who was named in the ordinance. The property of the Chicago City Railway Company was appraised and its value was fixed in the ordinance at $21,000,000, to which amount the ordinance provides the cost of certain better-

236—23

ments were to be added; that the net profits arising from the operation of said street railway system, after certain fixed charges and a dividend of five per cent upon the capital invested had been paid to the Chicago City Railway Company, should be divided between the city of Chicago and the Chicago City Railway Company,—that is, fifty-five per cent of such net earnings should go to the city of Chicago and forty-five per cent thereof to the Chicago City Railway Company,—and the city reserved the right to take over the property of the Chicago City Railway Company any time during said term of twenty years, and in case it did take over said property itself or the same should be transferred to another street railway company under the terms of said ordinance, the price at which said property should be taken over by the city or transferred to another corporation by the Chicago City Railway Company was fixed and determined by the said ordinance. The ordinance of February 11, 1907, contains a referendum clause, and upon submission to the electors of the city said ordinance was adopted, and on April 15, 1907, it was accepted by the board of directors of the Chicago City Railway Company, and on July 1, 1907, the Chicago City Railway Company executed its bonds in the sum of $10,000,000, and secured the payment thereof by a mortgage upon all its property to the First Trust and Savings Bank, trustee.

The bill further avers that on July 25, 1907, the complainant notified the Chicago City Railway Company, its officers and directors, that he protested against the expenditure of any of the moneys of the Chicago City Railway Company under the ordinance of February 11, 1907, and that he claimed the said ordinance was void. It was also averred, on information and belief, that large sums of money had been wrongfully paid out by the officers and directors of the Chicago City Railway Company to persons in the city of Chicago to procure the passage of said ordinance of February 11, 1907, and that large sums of money

had been paid out by the Chicago City Railway Company, its officers and directors, in commissions for selling said bonds.  It was also averred, upon information and belief, that the officers and directors of said Chicago City Railway Company were interested in the north and west side street car lines in the city of Chicago, and that by reason of such interest they sacrificed the rights of the Chicago City Railway Company in the streets of the city of Chicago by accepting said ordinance of February 11, 1907, to further their interests in the north and west side street car lines of the city of Chicago.

The bill prays that the ordinance of February 11, 1907, be declared *ultra vires* the city of Chicago and the Chicago City Railway Company, and that said ordinance be canceled, set aside and held for naught; that the city of Chicago be ordered to refund to the Chicago City Railway Company any sum or sums of money which it has received from said Chicago City Railway Company by virtue of the provisions of said ordinance, and that it be required to place said Chicago City Railway Company *in statu quo* as to all of its rights in the streets of the city of Chicago as they existed at the time of the passage of the ordinance of February 11, 1907; that the city of Chicago be required to pay to the Chicago City Railway Company all damages which the Chicago City Railway Company has sustained by reason of the passage and enforcement of said ordinance of February 11, 1907, and that the further payment of any money by the city of Chicago or the Chicago City Railway Company by virtue of said ordinance of February 11, 1907, be enjoined and restrained; that the officers and directors of the Chicago City Railway Company may be directed to re-pay to the treasurer of the Chicago City Railway Company all moneys which they have paid out or caused to be paid out by virtue of the provisions of said ordinance of February 11, 1907; that the defendants Bion J. Arnold, A. B. Fleming and C. V. Weston, who constitute the board

of supervising engineers created by said ordinance of February 11, 1907, be ordered and directed to re-pay to and turn over to the treasurer of the Chicago City Railway Company all moneys paid to them, or either of them, as salaries under the provisions of the ordinance of February 11, 1907; that all persons who are now or who may hereafter be made defendants to said bill be required to account for and pay over to the treasurer of said Chicago City Railway Company all moneys of said Chicago City Railway Company paid out or received to secure the passage of said ordinance of February 11, 1907; that said mortgage given to secure the payment of said bonds of the Chicago City Railway Company, and said bonds, be canceled, set aside and held for naught and the Chicago City Railway Company be enjoined from paying any interest on said bonds; that said J. P. Morgan & Co., the Harris Trust and Savings Bank, the First Trust and Savings Bank, trustee, and all persons who are now defendants or may hereafter be made defendants to this bill, be required to pay to the treasurer of said Chicago City Railway Company all moneys which they have received as commissions in negotiating or selling said bonds, and that a receiver be appointed of the property and assets of the Chicago City Railway Company.

ELIJAH N. ZOLINE, for appellant.

JOHN P. WILSON, for appellee the Chicago City Railway Company.

WALTER L. FISHER, (EDWARD J. BRUNDAGE, Corporation Counsel, of counsel,) for other appellees.

Mr. JUSTICE HAND delivered the opinion of the court:

It is first contended that the ordinance of February 11, 1907, impairs the charter rights of the Chicago City Railway Company as they existed at the time of the passage

of said ordinance, and that said ordinance is therefore *ultra vires* the city of Chicago and the Chicago City Railway Company, and void.  To sustain this proposition the appellant sets out in his bill the ordinance of August 15, 1858, the acts of 1859 and 1865, and the ordinances passed by the city of Chicago, the village of Hyde Park and the town of Lake from 1858 to 1906, so far as they apply to the Chicago City Railway Company, and then insists that under those several ordinances and statutes the Chicago City Railway Company had the right, on February 11, 1907, to continue to operate its entire system of street railroads in the streets of the city of Chicago upon the south side until such time as the city, under the ordinances of 1858, should purchase from the Chicago City Railway Company its entire system of street railroads.  It is urged, however, by the appellees, that from an examination of said ordinances and the acts of the legislature it will be found that the contention of the appellant is not true as a matter of law or as a matter of fact.

It was held in *Blair* v. *City of Chicago,* 201 U. S. 400, that the act of 1865 did not have the effect to extend the right of the Chicago City Railway Company to occupy the streets of the city of Chicago, but that the right to occupy said streets could only be acquired from the city of Chicago, and that the only effect of the act of 1865, in the particular now under consideration, was to extend the corporate life of the Chicago City Railway Company ninety-nine years from February 14, 1859.

In *People* v. *Chicago Telephone Co.* 220 Ill. 238, it was held that where the corporate authorities of towns or villages had granted rights to public service corporations to occupy their streets and no time was fixed when such rights should cease, such rights did not exist in perpetuity, but that they would cease to exist when the municipalities granting such rights ceased to exist, as the village of Hyde

Park and the town of Lake ceased to exist, by annexation to the city of Chicago.

It will be found that in some of the ordinances of the city of Chicago passed prior to 1875, when the city adopted the City and Village act, the right of the Chicago City Railway Company to occupy the streets of the city was limited to a time certain and not until the city should purchase said street railroads, and that in a number of the ordinances passed by the corporate authorities of the village of Hyde Park and the town of Lake prior to 1878, the date of annexation, there was no time limit when the right to occupy the streets of said village or town conferred upon the Chicago City Railway Company should expire. It will also appear that several of said ordinances were passed by the city of Chicago subsequent to the time of the adoption of the City and Village act, which act expressly limited the power of the city to grant the right to occupy the streets of the city with street railroads to the period of twenty years. In those cases, therefore, where the ordinances of the city fixed a time when the right to occupy the streets of the city should expire, and that time had expired prior to February 11, 1907, and in those cases where the Chicago City Railway Company was operating its railroad in streets formerly located in the village of Hyde Park or the town of Lake under ordinances passed by said village or town fixing no time when such right should expire, the Chicago City Railway Company was operating its railroads in such streets without authority of law. And the same would be true where the Chicago City Railway Company was operating under ordinances passed by the city subsequent to 1875, when it had been operating under said ordinances more than twenty years. The ordinance of 1858 provided that the cars in the streets covered by that ordinance should be operated by animal power. By ordinances passed by the city of Chicago the city had authorized the Chicago City Railway Company to operate its cars by electricity. The

right to so operate was, however, limited to ten years in one instance and in another to eight years. The city had, as early as 1883, denied the power of the Chicago City Railway Company to operate its railroads in the streets of the city for ninety-nine years under the act of 1865, and when an ordinance was passed in that year by the city extending the Chicago City Railway Company's right to operate its railroads in the streets of the city for twenty years, it was expressly provided that no new rights for a longer period than twenty years should be conferred upon the Chicago City Railway Company to operate its railroads in the streets of the city by said ordinance, and when the act of 1883 expired, in 1903, the city, with like limitations, extended the rights of the Chicago City Railway Company to occupy the streets of the city with its railroads for short periods. At the time the ordinance of 1907 was passed, not only was there pending a bitter controversy between the city of Chicago and the Chicago City Railway Company over the right of the Chicago City Railway Company to occupy the streets of the city with its railroads, but in many instances the Chicago City Railway Company was operating in the streets of the city without any authority and in open disregard of the law. The act of 1903 provided for the taking over of the street railroads by the municipalities of the State in which they were located, (*Lobdell* v. *City of Chicago,* 227 Ill. 218;) and the time was ripe in 1907 for some adjustment of the differences between the city of Chicago and the Chicago City Railway Company, the result of which was the passage of the ordinance of February 11, 1907, by the city of Chicago and the acceptance of such ordinance by the Chicago City Railway Company, and the question is, had the city the power to pass said ordinance and the Chicago City Railway Company the power to accept the same?

By the act of 1865 it was provided "that it shall be competent for the said common council, with the written con-

sent or concurrence of the other party or parties, or their assigns, to any of said contracts, stipulations, licenses or undertakings, to amend, modify or annul the same." In the *Blair case, supra,* the Supreme Court of the United States held that the above provision was amply sufficient to allow the city of Chicago and the Chicago City Railway Company, by agreement, to change the power by which the Chicago City Railway Company should operate its cars from animal power to electricity, and we think said language sufficiently broad to allow the city of Chicago and the Chicago City Railway Company to abrogate the rights of the city and the Chicago City Railway Company created by the ordinances of 1858 and those subsequently passed, under which the Chicago City Railway Company had the right to operate in the streets of the city a fragmentary system of street railroads, and to adopt in place thereof the ordinance of 1907, which would give to the city of Chicago and the Chicago City Railway Company a complete system of street railroads in the south section of the city. The corporate powers of the Chicago City Railway Company are, as defined by the act of 1859, "to construct, maintain and operate a single or double track railway, with all necessary and convenient tracks for turn-outs, side-tracks and appendages in the city of Chicago, and in, on, over and along such street or streets, highway or highways, bridge or bridges, river or rivers, within the present or future limits of the south or west division of the city of Chicago, as the common council of said city have authorized said corporators, or any of them, or shall authorize said corporation so to do, in such manner and upon such terms and conditions, and with such rights and privileges, as the said common council has or may have contracted with said parties, or any or either of them, prescribed." In *Morville* v. *American Tract Society,* 123 Mass. 129, on page 136, the court said: "The power to make all such contracts as are necessary and usual in the course of business, or are reasonably incident to the

objects for which a private corporation is created, is always
implied, where there is no positive restriction in the char-
ter." We therefore conclude that the ordinance of Feb-
ruary 11, 1907, was not *ultra vires* the city of Chicago or
the Chicago City Railway Company, and void.

It is next contended that even though it be conceded
that the city of Chicago had the power to pass the ordi-
nance of February 11, 1907, the board of directors of the
Chicago City Railway Company could not accept said ordi-
nance, and that before said ordinance would be binding upon
the city of Chicago and the Chicago City Railway Com-
pany it must be unanimously accepted by the stockholders
of the Chicago City Railway Company. Section 4 of the
act of 1859 provides that "all the corporate powers of said
corporation shall be vested in and exercised by a board of
directors and such officers and agents as said board shall
appoint." As we have seen, it was within the corporate
powers of the city of Chicago to pass, and of the Chicago
City Railway Company to accept, the ordinance of Feb-
ruary 11, 1907. That being true, we think it necessarily
follows that the acceptance of the ordinance could be con-
summated for and on behalf of the Chicago City Railway
Company by its board of directors, and that their accept-
ance would be binding upon the stockholders of the cor-
poration. In the American and English Encyclopedia of
Law (vol. 21,—2d ed.—p. 863,) it is said: "The general
power to administer the affairs of a corporation is usually
vested in a board of directors or trustees elected by the
stockholders. The authority of directors is very extensive,
and includes, generally, the power to do any act or make
any contract in the conduct of the company's affairs or busi-
ness which is within the limits of the powers conferred upon
the corporation by its charter and which is necessary or
proper to enable the corporation to accomplish the purposes
of its creation. And contracts so made, in the absence of
any express restriction, will bind the corporation although

not assented to or ratified by the stockholders." This text is well supported by the adjudicated cases. (*Dickinson* v. *Consolidated Traction Co.* 114 Fed. Rep. 232; *Leslie* v. *Lorillard,* 110 N. Y. 519; 18 N. E. Rep. 363; *Beveridge* v. *New York Elevated Railroad Co.* 112 N. Y. 1; 19 N. E. Rep. 489.) The cases relied upon by appellant, notably that of *Chicago City Railway Co.* v. *Allerton,* 85 U. S. 233, involved the exercise of powers by the board of directors other than corporate powers, and those cases are not in point. In *Dickinson* v. *Consolidated Traction Co. supra,* on page 254, it was said: "It is unreasonable to suppose that a power conferred by the creative act should, in the absence of any other mode prescribed for its exercise, be made to depend upon the unanimous consent of the stockholders. Corporate existence might be so imperiled and corporate ends defeated." In *Beveridge* v. *New York Elevated Railroad Co. supra,* it was said: "What business a corporation can do within its chartered limits and in or about that business by statutory authority, its directors hold a delegated power from the legislature to do for it."

It is also urged that the ordinance of February 11, 1907, is invalid by reason of the fact that the property owners of the land abutting upon the several lines of the Chicago City Railway Company's railroad in the streets of the city are not required to consent to the adoption of said ordinance or to the continuation of said railroads in said streets, as it is claimed is provided by clause 90 of section 62 of the City and Village act. The act of 1903 provides that the city shall have the power to grant the use of its streets for street railway purposes without the petition or consent of any of the owners of the land abutting or fronting upon any street or public way, or portion thereof, in which street railway tracks are already located at the time of making such grant. It is apparent, therefore, that the act of 1903, and not clause 90 of section 62, controls in this case, and that the consent of the owners of property abutting upon

the several lines of railroad of the Chicago City Railway Company laid in the streets of the city of Chicago was not necessary to the passage of said ordinance of February 11, 1907.

It is also said that by the ordinance of February 11, 1907, a partnership is created between the city of Chicago and the Chicago City Railway Company for the purpose of operating the street railroads of the Chicago City Railway Company in the city of Chicago. The law is clear that the city of Chicago has the right to exact compensation from street railway companies occupying its streets with their railroads for the privilege of so doing, (*Lobdell* v. *City of Chicago, supra,*) and the fact that the city is to receive fifty-five per cent of the net earnings of said Chicago City Railway Company during the term that it shall occupy the streets of the city of Chicago with its tracks under the ordinance of February 11, 1907, does not make the city of Chicago and the Chicago City Railway Company partners in the operation of said street railway system.

It is also urged that the Chicago City Railway Company, by the acceptance of said ordinance, has taken the control of its street railway system from its board of directors and delegated such control to the board of supervising engineers created by said ordinance. The ordinance of February 11, 1907, provides for an appraisement of the property of the Chicago City Railway Company; that to the amount of the appraisement, which is fixed by the ordinance at $21,000,000, there shall be added the cost of the re-equipment of said street railway system. It also provides for the payment of certain fixed charges, and then provides that thereafter the net earnings of the Chicago City Railway Company shall be divided between the city of Chicago and the Chicago City Railway Company. It is apparent that it was necessary to provide, by ordinance, for some method whereby the net earnings of the Chicago City Railway Company might be determined, and the board of

supervising engineers created by the ordinance was created to supervise the re-building and re-equipment of the roads of the Chicago City Railway Company and the operation of said roads so far as might be necessary to reach a correct conclusion of what the net earnings of the railroad would be when it was in operation. The city must necessarily be represented by some officer or some board in the determination of the amount which it is to receive from the Chicago City Railway Company for the use of its streets for street railway purposes, and we see no legal objection to the creation of said board of supervising engineers or to the powers conferred upon such board or the duties imposed upon it by the ordinance of February 11, 1907. The board of supervising engineers occupies a relation to the street car system operated upon the south side of the city somewhat analogous to that which the board of local improvements occupies to public improvements which are to be made in the city, and we are unable to see, and the appellant has not pointed out, how the creation of said board of supervising engineers works any injustice to the city of Chicago, the Chicago City Railway Company or to him.

We have given every contention of the appellant made in a brief containing three hundred and twenty-four pages and a reply brief containing fifty-two pages the most careful consideration, and are of the opinion that the ordinance of February 11, 1907, is a valid ordinance and binding upon the city of Chicago, the Chicago City Railway Company and the appellant, as a stockholder of said Chicago City Railway Company. To hold otherwise would be to hold that the Chicago City Railway Company has the right, under the ordinance of August 15, 1858, to occupy all the streets upon the south side of the city until such time as the city should, under the terms of that ordinance, purchase the street railway system of the Chicago City Railway Company, and that as the city is now indebted to substantially the constitutional limit, the city could never purchase, for

want of funds, from the Chicago City Railway Company, said street railway system, which would, in effect, confer upon the Chicago City Railway Company the right to perpetually occupy the streets of the city upon the south side for street railway purposes.   It would also require a holding to the effect that if the appellant, or any other single stockholder owning one share of stock in the Chicago City Railway Company, should object and refuse to give his consent to an ordinance which was satisfactory to the city of Chicago and the people of the city of Chicago and to every other stockholder in the Chicago City Railway Company, whereby the worn-out street railway system of the south side should be re-organized, rehabilitated and rejuvenated, he could prevent the acceptance of such ordinance and the modernizing of said street railway system practically for all time.   We cannot, therefore, give our assent to the view of the appellant.

There are a number of other grounds which we will briefly advert to, which we are of the opinion clearly show the superior court properly sustained demurrers to said bill.

*First*—It is clear, we think, that the appellant, as a single stockholder,—and no other stockholder has joined him in this suit,—cannot maintain this bill.   Under the ordinance of February 11, 1907, the Chicago City Railway Company only agreed to construct and operate a system of street railways in the streets of the city of Chicago, which was clearly within the chartered powers of the company. The charter provides, in express terms, that the contracts under which the street railway company shall operate in the streets of Chicago may be "amended, modified or annulled" by the city council with the written consent of the company, and that the terms and conditions upon which the company shall operate its railways in the streets shall be such as the city council shall, by contract with the company, prescribe.   It was therefore clearly within its chartered power for the Chicago City Railway Company, by

the acceptance of said ordinance, to enter into a contract by which the terms and conditions upon which its street railway should be operated should be prescribed, and it is elementary that in the absence of any provision to the contrary in the charter, a majority of the stockholders control in deciding corporate questions requiring their action. In Clark & Marshall on Private Corporations, on page 1688, it is said: "A stockholder cannot maintain a bill in equity to set aside an act or transaction which was done irregularly or illegally but which a majority of the stockholders are entitled to do regularly or legally. Nor can a stockholder sue to set aside a transaction on the part of the directors on the ground that it was fraudulent, irregular, illegal or in excess of the powers conferred upon the directors where the transaction is within the powers of the corporation, and such, therefore, as a majority of the stockholders may ratify, unless, as may sometimes be the case, it is impossible to procure a meeting of the stockholders to pass upon the transaction." And in Purdy's Beach on Private Corporations (vol. 2, sec. 681, p. 998,) it is said: "If the thing complained of is a thing which, in substance, the majority of the members are entitled to do, or if something has been done irregularly which the majority are entitled to do regularly, or if something has been done illegally which the majority are entitled to do legally, there can be no use in having a litigation about it, the end of which is only that a meeting has to be called and then ultimately the majority gets its wishes. If it is a matter of that nature it only comes to this: that the majority are the only persons who can complain that a thing which they are entitled to do has been done irregularly."

It is expressly stated in the bill that over 169,000 shares of the total capital stock of 180,000 shares of the company are registered in the names of J. P. Morgan & Co. and Walter B. Horn and Thomas W. Joyce, and "that the defendants J. P. Morgan & Co., the said directors, and said

Horn and Joyce last named, have conspired together and agreed to act together for the purpose of accepting and executing the said illegal ordinance of February 11, 1907." It is also alleged that in accepting the ordinance the said directors were acting upon the direction of the defendants J. P. Morgan & Co., who are claimed to control a large majority of the stock of the company. It therefore affirmatively appears from the allegations of the bill that the registered owners of more than nine-tenths of the capital stock of the Chicago City Railway Company affirmatively approved of the acceptance of the ordinance by the board of directors at the date of such acceptance.

*Second*—We are also of the opinion that the appellant was barred of the right to attack the ordinance of February 11, 1907, by his *laches*. The ordinance was passed on February 11, 1907, and after having been ratified by the electors of the city of Chicago was accepted by the Chicago City Railway Company on April 15, 1907, and on July 1, 1907, the Chicago City Railway Company executed its trust deed and bonds to the amount of $10,000,000, which bonds it sold and was proceeding to expend the proceeds thereof in the re-equipment of its street railway property covered by said ordinance. On the 25th day of July, 1907, the appellant protested to the officers and directors of the Chicago City Railway Company that the ordinance was void and demanded that no money be expended under the ordinance. He, however, took no action in court, by filing his bill, until the 21st day of October, 1907,—six months after the passage of the ordinance and three months subsequent to his protest. If he desired to act in the premises he should have acted with sufficient promptness to have enabled the court to do justice to him without doing injustice to others. In *Galliher* v. *Cadwell*, 145 U. S. 373, the court said: "*Laches* is not, like limitation, a mere matter of time, but principally a question of the inequity of permitting the claim to be enforced,—an inequity founded upon some change in

the condition or relations of the property or the parties."
And in *Townsend* v. *Vanderwerker,* 160 U. S. 171, the
court said (p. 186) that *laches* depends on "whether, un-
der all the circumstances of the particular case, plaintiff is
chargeable with a want of due diligence in failing to in-
stitute proceedings before he did." And in *Morse* v. *Sei-
bold,* 147 Ill. 318, this court said (p. 325): "*Laches* has
been defined to be such neglect or omission to assert a right
as, taken in conjunction with lapse of time more or less
great, and other circumstances causing prejudice to an ad-
verse party, operates as a bar in a court of equity." In
*Coolidge* v. *Rhodes,* 199 Ill. 24, this court said (p. 32):
"The more important question in the case is whether com-
plainants are barred by *laches.* Where this defense appears
upon the face of the bill it may be taken advantage of by
demurrer, either special or general." The appellant became
a stockholder in 1905, and after the street car controversy
between the city of Chicago and the Chicago City Railway
Company was at its height, and he having injected himself
into the controversy by becoming a stockholder in the Chi-
cago City Railway Company at that time, if he desired to
prevent the consummation of the settlement of that con-
troversy by the acceptance of the ordinance of February 11,
1907, by the railway company, he should have acted at once
upon its passage by the city council and not have waited
until October 21, 1907, when the city of Chicago, the Chi-
cago City Railway Company and the bondholders of the
railway company could not be placed *in statu quo* without
great loss to them.

*Third*—The bill sought relief on grounds other than
that the ordinance of February 11, 1907, was *ultra vires*
and void and against parties in no way connected with the
city of Chicago, and we therefore think it multifarious. In
*Swift* v. *Eckford,* 6 Paige's Ch. 22, the court said: "If a
joint claim against two or more defendants is improperly
joined in the same bill, with a separate claim against one

of those defendants only, in which the other defendants have no interest and which is wholly unconnected with the claim against them, all or either of the defendants may demur to the whole bill for multifariousness."

The amendment to the bill and the supplemental bill were not sworn to, and the court did not abuse its discretion in refusing to permit the amendment to be made or the supplemental bill to be filed.

Finding no reversible error in this record the decree of the superior court will be affirmed.   *Decree affirmed.*