## CHICAGO RYS. CO. et al. v. ILLINOIS COMMERCE COMMISSION et al.

(District Court, N. D. Illinois, E. D.   January 9, 1922.)

No. 2496.

1. **Courts ⬤═282(3)—Federal court has jurisdiction over suit to enjoin enforcement of order reducing street car fares.**

   A federal court has jurisdiction over a suit to enjoin enforcement of an order of the Illinois Commerce Commission reducing street car fares, on the ground of alleged confiscation of property, in violation of the United States Constitution.

2. **Carriers ⬤═18(6)—Order of state Commerce Commission may be enjoined as complete legislative act, though motion for reconsideration might be made.**

   An order of the Illinois Commerce Commission reducing fares chargeable by street railroad companies, in force immediately after its passage, was a complete exercise of the legislative power, so as to support a suit for injunction, in the absence of any provision for suspension by an application for rehearing, though under Public Utilities Act Ill. § 67, a motion to reconsider might have been made and entertained, in the discretion of the, Commission.

3. **Carriers ⬤═18(6)—Injunction granted to restrain enforcement of order reducing street car fares, if confiscatory.**

   On application for a preliminary injunction restraining the enforcement of an order of a state commission reducing street car fares, all doubts will be resolved against plaintiff; but, if the record discloses that the order in fact confiscates property without adequate and just compensation, the court is bound to grant the injunction.

4. **Carriers ⬤═12(7)—Order reducing street car fares void, if not based on substantial evidence.**

   The Illinois Public Utilities Act grants power to the Commerce Commission to enter orders only when based on substantial evidence, and if the record contains no substantial evidence an order reducing street car fares is void.

5. **Carriers ⬤═12(4)—Commission held without power to prescribe inadequate rate to compel improved methods of doing business.**

   Under Commerce Act Ill. § 75, authorizing the state Commerce Commission to regulate methods of operation of public utilities, and providing for enforcement of changes in operation by application to the circuit or superior court, the commission cannot force improved methods of operation, by penalizing street railroad companies with a rate which will not return even operating expenses.

---

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. Carriers ⊂⇒12(7)—Evidence insufficient to show such savings could be made in street railroad operation as would make rate adequate.**

In a suit to enjoin the enforcement of an order of a state Commerce Commission reducing street car fares, evidence *held* insufficient to show that such savings could be made in operating expenses as would render the rate prescribed adequate.

**7. Carriers ⊂⇒12(5)—"Depreciation," as affecting rates, defined.**

"Depreciation" in the property of street railroad companies, as affecting rates chargeable, means the loss in value of some destructible property over and above current repairs.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Depreciate.]

**8. Carriers ⊂⇒12(9)—State commission without power to prevent setting aside of depreciation fund required by franchise.**

Where ordinances authorize and require street railroad companies operating thereunder to set aside each year a certain percentage of gross receipts for renewals, and provide that at the end of the grant to the companies the city may purchase the properties at the valuation fixed by the ordinances, or, if it grants the right to other companies to operate the railways, such other companies should take over the properties at the same price, the state Commerce Commission, in proceedings to determine fares, has no power to prevent the setting aside of funds representing a depreciation sufficient to take care of necessary renewals, since, if such fund should not be on hand at the expiration of the grant, an abatement of the contract price could be secured, and the right to set aside the fund is a property right, which cannot be taken away by the state without the consent of the companies, or without due compensation.

**9. Carriers ⊂⇒12(5)—Share of street railroad earnings paid city not included in earnings in fixing rates.**

The share of the earnings of street railroad companies paid to the city for the use of its streets is an overhead expense, to be paid before dividends or interest on invested capital can be estimated, and cannot be included in estimating net earnings to the shareholders for rate-fixing purposes.

**10. Carriers ⊂⇒12(5)—Cannot be required to do business at loss, because of large earnings of previous years.**

Street railroad companies operating under contracts with the city made in 1908 cannot be required to operate at a loss, because of large returns had by the stockholders for several years subsequent to the making of the contract.

**11. Courts ⊂⇒369(2)—Decision of state Supreme Court conclusive in federal District Court, when writ of error to federal Supreme Court dismissed.**

Where the Supreme Court of a state sustained the validity of an order of the state Utilities Commission increasing street car fares over those prescribed in contract ordinances, and a writ of error to the Supreme Court of the United States was dismissed for want of jurisdiction, the claim that the contract rates could not be impaired is foreclosed, so far as the United States District Court is concerned.

**12. Carriers ⊂⇒12(7)—Mismanagement determined by comparing with operating costs of similar companies.**

In absence of evidence that all businesses of the same nature are mismanaged, there is no better way of determining whether a street railroad is mismanaged, for rate-making purposes, than to compare its operating costs with other businesses of a similar character.

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by the Chicago Railways Company and others against the Illinois Commerce Commission and others. On application for a temporary injunction. Injunction granted.

On the filing of the bill in this cause a temporary restraining order was entered, and the defendants duly notified to appear on a day certain to respond to a motion for a preliminary injunction. The bill states:

That the plaintiffs are Illinois corporations owning street railway systems constructed upon the streets of the city of Chicago with the consent of the city, evidenced by ordinances passed by the city council on February 11, 1907, March 30, 1908, and March 15, 1909. That since February 1, 1914, the four plaintiffs' system has been operated under the designation of "Chicago Surface Lines," pursuant to an operating agreement between the companies, and with the consent of the city expressed by ordinance passed November 13, 1913.

That the defendant Illinois Commerce Commission is an administrative board created by act of the Illinois Legislature, in force July 1, 1921 (Laws 1921, p. 702). That the defendant city of Chicago is a municipal corporation organized and existing under the General Cities and Villages Act of Illinois. That the defendant Edward J. Brundage is the Attorney General and chief law officer of the state of Illinois.

That the state Public Utilities Commission of Illinois was created by an act in force January 1, 1914 (Hurds Rev. St. 1919c, 111a). That pursuant to that act the plaintiffs, on or about January 1, 1914, filed with the Utilities Commission schedules showing their rates and charges then in force, and that by order of that commission, entered August 6, 1919, the rate of fare on the plaintiffs' lines was increased from five to seven cents. That the validity of this order was sustained by the Supreme Court of Illinois in Chicago Railways Co., et al. v. City of Chicago, 292 Ill. 190, 126 N. E. 585, and a writ of error from the Supreme Court of the United States to review that judgment was, on November 21, 1921, dismissed for want of jurisdiction.

That on November 5, 1920, the state Utilities Commission fixed the then present fair value of the plaintiffs' properties at an amount approximately of $160,000,000, and established an 8-cent fare based upon that valuation. That by act in force July 1, 1921, the Illinois Commerce Commission superseded the Illinois Public Utilities Commission.

That on July 8, 1921, the city of Chicago and others filed with the Illinois Commerce Commission petitions for the restoration of the 5-cent fare. That an extended hearing was had, and that on November 23, 1921, the Commerce Commission entered an order re-establishing the original ordinance contract 5-cent rate, to take effect November 25, 1921, at 12:01 o'clock a. m.

That approximately 2,000,000 passengers are carried daily over the plaintiffs' lines, and that for the fiscal year ending January 31, 1921, plaintiffs' net earnings amounted to $9,723,875.75; that for the 12 months ending October 31, 1921 plaintiffs' net earnings amounted to $10,768,767.86. That in order properly to finance, maintain, preserve, and improve their properties, to maintain credit and meet public obligations, it is necessary that plaintiffs should receive a fair rate of return upon the present value of their properties employed in the public service.

That to that value, as determined by the state Public Utilities Commission of Illinois on November 5, 1920, to be approximately $160,000,000, there have been capital additions to the properties to the value of nearly $1,500,000, and that a fair net return to the plaintiffs on the total investment is at least $12,000,000 annually. That the plaintiffs will be able to receive as gross earnings under the 5-cent rate fixed by the Illinois Commerce Commission on November 23, 1921, a sum not exceeding $38,000,000 per annum, and that the annual operating expenses of the plaintiffs will amount at least to the sum of $44,000,000.

That the defendant Commerce Commission, in making its order fixing the fare as therein stated, disregarded the laws of the estate of Illinois to the effect that the rates of fare of plaintiffs and other public utilities shall at all times be just, reasonable, and sufficient. That the real ground upon which

the commission fixed the 5-cent rate of fare was that such rate was prescribed in the original settlement ordinances of the city of Chicago. That the commission did not base its order upon the evidence, or upon any sustaining proof. That its action was without authority of law, in disregard of its powers under the Commerce Commission Act and of the rights of plaintiffs under the Fourteenth Amendment of the Constitution of the United States.

That if plaintiffs comply with the order requiring the 5-cent rate they will not receive sufficient revenue to pay the actual operating expenses of their system, with the result that they will be forced into bankruptcy, and suits to foreclose their mortgage indebtedness immediately instituted. That, should the plaintiffs fail to comply with the order of the commission, they would also be subjected to certain pains and penalties prescribed by the Illinois Commerce Commission Act.

That section 67 of the Illinois Commerce Commission Act would compel the plaintiffs to charge only the 5-cent rate fixed by the order of November 23, 1921, from the named effective date, which was November 25, 1921, at 12:01 o'clock a. m., leaving to the discretion of the commission whether a stay of said order should be granted and that said order was conclusive, without any right of judicial investigation as to whether the plaintiffs had been thereby deprived of rights protected by the Constitution of the United States. That any application to the commission for a stay or postponement of said order would be wholly futile.

That the difference between the revenues of the plaintiffs from the 5-cent fare fixed by the commission and the 8-cent fare authorized by the order of the state Public Utilities Commission, issued November 5, 1920, would amount to approximately $60,000 a day. That if plaintiffs are compelled to carry passengers at the 5-cent rate it will amount to a confiscation of their property without due process of law. That unless a temporary restraining order is entered approximately $60,000 a day will be lost to plaintiffs.

The bill prays for a temporary restraining order, for an interlocutory injunction pendente lite, for a permanent injunction against the enforcement of the commission's order, and for general relief. The cause is now before the court upon the motion for a preliminary injunction.

The only evidence offered by the plaintiffs was the verified bill and accompanying affidavits. The defendants offered all of the proceedings had at the hearing before the Illinois Commerce Commission, together with a statement used on the oral argument by Supervisor of Orders Woods, representing the commission.

W. W. Gurley, James M. Sheean, Harry P. Weber, and Charles S. Babcock, all of Chicago, Ill., for plaintiffs.

Edward J. Brundage, Atty. Gen., of the State of Illinois.

Illinois Commerce Commission, pro se, by Frank L. Smith, Chairman, and Harvey E. Wood, Supervisor of Orders.

Samuel A. Ettelson, Corp. Counsel, Chester E. Cleveland, Daniel A. Roberts, and James G. Skinner, all of Chicago, Ill., for city of Chicago.

Jacob Legion Tenny, of Chicago, for certain interveners.

Before EVANS and PAGE, Circuit Judges, and CARPENTER, District Judge.

CARPENTER, District Judge (after stating the facts as above). [1, 2] The jurisdiction of this court ought not to be seriously, and cannot be effectively, challenged. Roller v. Holly, 176 U. S. 398, 20 Sup. Ct. 410, 44 L. Ed. 520; Willcox et al. v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 383, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; L. & N. R. Co. v. Central Stock Yards Co., 212

U. S. 132, 29 Sup. Ct. 246, 53 L. Ed. 441; Coe v. Armour Fertilizer Works, 237 U. S. 413, 35 Sup. Ct. 625, 59 L. Ed. 1027.

Willcox v. Consolidated Gas Company, supra, concerned a bill to enjoin the enforcement of certain acts of the New York state Legislature, and an order of the Gas Commission of that state fixing rates to be charged by the complainant, which were alleged to be confiscatory, and therefore in violation of the Fourteenth Amendment of the Constitution. The jurisdiction of the chancellor in the court of first instance was attacked. The court said (212 U. S. at page 40, 29 Sup. Ct. 195, 53 L. Ed. 383, 48 L. R. A. [N. S.] 1134, 15 Ann. Cas. 1034):

"They assume to criticize that court for taking jurisdiction of this case as precipitate, as if it were a question of discretion or comity, whether or not that court should have heard the case. On the contrary, there was no discretion or comity about it. When a federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction (Cohens v. Virginia, 6 Wheat. 264, 404), and in taking it that court cannot be truthfully spoken of as precipitate in its conduct. That the case may be one of local interest only is entirely immaterial, so long as the parties are citizens of different states or a question is involved which by law brings the case within the jurisdiction of a federal court. The right of a party plaintiff to choose a federal court, where there is a choice, cannot be properly denied. In re Metropolitan Railway Receivership, 208 U. S. 90–110; Prentis v. Atlantic Coast Line et al., 211 U. S. 210. In the latter case it was said that a plaintiff could not be forbidden to try the facts upon which his right to relief is based before a court of his own choice, if otherwise competent."

The defendants urge Prentis v. Atlantic Coast Line, 211 U. S. 210, 29 Sup. Ct. 67, 53 L. Ed. 150, as defeating the jurisdiction of this court, because the record does not disclose that the plaintiffs have applied for the rehearing provided for in section 67 of the Public Utilities Act.

The order of the Illinois Commerce Commission was a complete exercise of the legislative power of the state, and was in force immediately after its passage, notwithstanding a motion to reconsider might have been urged and entertained. If the state of Illinois, vesting the power to regulate rates in the Commerce Commission, had provided that the orders of the commission should not be put into effect until after a certain time, within which an application for a rehearing could be made, another question would be involved; but the statutes of Illinois did not so provide, and, the granting or denying of a petition for rehearing being wholly within the discretion of the commission, the legislative act was complete upon the entry of the order.

[3] The question involved here is that of a United States court exercising power under the Constitution of the United States to protect a citizen against the alleged confiscation of its property by some agency of a state. The matter is of extreme importance, because the relief prayed for interferes with the Illinois Commerce Commission, and would stop ad interim the regulatory power of the state over public utilities. It is a serious and very grave matter, and all doubts are resolved against the plaintiffs. If, however, the record discloses that the order of the state Commerce Commission is in fact a con-

fiscation of private property without adequate and just compensation, this court not only has the power to act, but is in duty bound to exercise that power.

It is quite apparent from a reading of Prentis v. Atlantic Coast Line, above referred to and relied upon by defendants, that there the court of first instance was the final legislative body, just as in this case the Illinois Commerce Commission was the final legislative body. The Prentis Case was carefully considered by Judge Hook in A., T. & Santa Fé Railway Co. v. Love et al. (C. C.) 174 Fed. 59, and by Judge Sanborn in the same case on appeal, 185 Fed. 321, 107 C. C. A. 403, and the logic of the opinions in those cases makes it quite impossible for a different conclusion to be reached here.

With reference to the plaintiffs in this case, it is clear that prosecution for violating the order of the commission would not be suspended by the application for a rehearing. The character, force, and effect of the commission's order while it remained in operation is in no respect modified or affected by the opportunity given by the statute to apply to the commission for a rehearing, and, however the order be styled, it is nevertheless, until changed or rescinded, the final legislative act of the state of Illinois. For an indeterminate time at least it is complete and binding so far as is concerned the public utility affected.

The sole point open to this court for decision on this motion is whether the 5-cent rate of fare ordered by the Illinois Commerce Commission will produce for the plaintiff companies sufficient revenue to pay operating expenses and a fair and just return for the value of their property devoted to the public use. The Illinois Commerce Commission is the principal defendant here, and we may look to its brief, if anywhere, for reasons to deny the motion for the preliminary injunction.

The Commerce Commission, as well as the city of Chicago, were invited to point out from the record facts which would justify this court in refusing to grant injunctive relief. The commission stated in its brief and argument:

"In coming to the conclusions expressed in our order, we took into consideration all the evidence introduced in the case before us, also the law creating the commission, the law governing public utilities generally as it has been set forth in court decisions, *matters of which we have special and official knowledge as members of the commission, and matters of common knowledge to all moderately well informed men.* However, all the figures herein discussed which concern the affairs of the companies,' and the tabulations attached hereto as appendices, were taken or deduced directly from the evidence in the case before us."

[4] The Public Utilities Act of Illinois granted power to the commission to enter orders only when based upon substantial evidence. It must follow, therefore, that unless the defendants can show that the record contains such substantial evidence, the order of the commission is void. L. & N. R. Co. v. Finn et al., 235 U. S. 601, 35 Sup. Ct. 146, 59 L. Ed. 379.

The plaintiffs having shown prima facie by the sworn bill and affidavits that the order of the commission was confiscatory, and there

being no way in which they could demonstrate that there was no substantial evidence introduced before the commission, without reading to the court the entire record made before that body, which comprises several volumes of testimony and exhibits, the court asked the defendants to point to the evidence upon which they relied to support the ruling. Defendants availed themselves of the opportunity thus afforded, and introduced all of the evidence heard by the commission. Time was given to them by this court to file a statement pointing out such evidence as the record might contain which they deemed would be sufficient in law to support the findings of the commission. The commission and the city of Chicago have filed statements, which will now be analyzed and discussed.

With the exception of one item, that of renewals, $4,853,487.00, they attempted to justify the order upon the ground that the companies could put into effect certain savings in operation. The attorneys for the commission and the city of Chicago in effect urge that the Illinois Commerce Commission has authority *to regulate the service by fixing the rates of fare charged therefor* of all public utilities in Illinois, and that the only limitation upon its control of rates is that the rates fixed shall be just and reasonable. That the authority to control rates carries with it control of operation.

[5] The Illinois Commerce Commission has the right to regulate the methods of operation employed by any public utility within the state, and section 75 of the Illinois Commerce Act (Laws 1921, p. 702) shows how changes in operation can be enforced by the commission, namely, by making application to the circuit or superior court in case the utility fails to comply with orders duly made. Nowhere, however, is the power given to reduce rates for the purpose of enforcing new methods of doing business.

The order of the commission found that at no time since the entry of the 8-cent fare order—

"have the companies rendered, nor are they now rendering. safe. adequate, or efficient service; that, on the contrary, the service rendered by them has during all said time been, and now is, grossly inadequate and inefficient; that said companies have not * * * complied with the law of the state of Illinois in relation to service, with the license ordinances of the city of Chicago, nor with any of the orders of said Public Utilities Commission of Illinois, or its predecessor, the state Public Utilities Commission of Illinois, as to service; and that said companies have not * * * shown any just or reasonable reason for not complying with said ordinances, law or orders, or for not furnishing adequate and efficient service."

The order then states that the service rendered by the plaintiff companies since November 5, 1920 (the date the 8-cent fare was established), and now being rendered by them, is reasonably worth no more that a 5-cent fare for adults and a 3-cent fare for children.

These findings are entirely beside the question. They might have been very important on a bill by the Attorney General to forfeit the charter of the companies. They have nothing whatever to do with the operating cost, but are based upon the opinion of the commission that the services actually rendered, no matter at what cost, are worth

in reality only 5 cents. The commission should have ordered whatever changes in their opinion were proper, and adjusted the rate after the various reforms had been carried out.

At this point it may be well to state that the record shows that the actual operating expenses of the Chicago Surface Lines, comprising wages, taxes, and power, amount to more than 6 cents for every passenger carried. It may be that the Surface Lines, the plaintiffs here, could improve their business methods; but the Illinois Commerce Commission is not permitted, under the law, to force that improvement by penalizing them with a rate which will not return even the operating expenses, and might, in fact, prevent them from rendering any service at all.

[6] In answer to the questions of the court during the oral argument to point out from the record specific facts which would justify the court in denying the injunction, we find in the brief of the commission two items: $616,581 for paving, and $409,717 for street cleaning—more than a million dollars. It was suggested that these expenditures had to be made because of the license ordinances; that because they were really municipal duties the patrons of the public utility should not be in effect taxed to pay them. The defendants finally admitted that these items are not properly a part of operating expenses, but are a part of the compensation the companies undertook to pay to the city of Chicago when they accepted the license ordinances.

The next deduction urged was $451,764 as an expenditure for maintenance for the year ending July 31, 1921. This deduction was made because the commission's chief accountant stated that in man hours and material maintenance it was at least 6 per cent. above normal for that year. The record, however, discloses that maintenance almost vitally necessary for the operation of the roads was deferred, because of abnormal prices of labor and material during the war and the subsequent reconstruction period. There is no evidence that in averaging the maintenance it was too high.

The next item is $900,000, being a 20 per cent. deduction on the prices of materials. That materials had decreased in prices 20 per cent. was deduced by the commission from Plaintiff's Exhibits 170 and 171. These exhibits showed the different prices of various materials going into maintenance during the past few years. The exhibits did not show how much of any material was used in maintenance, but the commission averaged the prices and deduced the conclusion that there could be a saving of 20 per cent. in the price of all materials. The commission states in its brief:

"We very frankly state the intention of our order was for the companies to take advantage of the falling market above referred to. It is a matter of common knowledge that all prices are falling. The commission knows and the court knows * * * that the prices of the things upon which the very life of the nation depends—the products of the farms, the ranges, and the plantations—are far below pre-war prices now, at the point of production. The commission knows, as a matter of common knowledge, that the weighted average reduction in the retail prices of 33 of the principal articles of food in Chicago from August 15, 1920, to August 15, 1921, was 18.22 per cent.; that

the weighted average reduction in the retail prices of 11 of the principal articles of dry goods in Chicago for the same period was 42.89 per cent."

The great difficulty with this argument is that you cannot run street cars on food and dry goods, and we have looked in vain through the record and in the briefs of the defendants to find some concrete suggestion which would warrant the court, even if it were pertinent in this case, to regulate the plaintiffs' expenditures for maintenance.

The commission, in urging the saving of 20 per cent., gave just as much importance to the purchase of sand as it did to steel rails, and yet the record shows that the companies had on hand during the present year a large quantity of rails, bought at a low price before the war, that this supply was exhausted, and that in the future the companies would be obliged to pay a very much higher price. The item of rails is one of the largest in the companies' budget of maintenance. $900,000 is 20 per cent. of $4,500,000, yet the evidence is that of the total cost of maintenance, amounting to $7,529,400, less than 45 per cent., or $3,400,000, is for materials. It is difficult, therefore, to see how 20 per cent. of $4,500,000 could be saved on a total expenditure of $3,400,000.

The next item of proposed saving in operation is $1,741,795, which the commission assumes may be made by rearrangement of schedules. The evidence shows clearly that on the hearing before the commission the plaintiffs introduced evidence which the vice chairman of the commission indicated showed that all had been done that was humanly possible in arranging schedules to eliminate overtime, and to reduce to a minimum the amount of payment for services not rendered. The concession by the vice chairman of the commission that the plaintiff companies had exercised the highest effort in getting the most effective system of handling their cars leaves nothing for us to say on this point.

Next there was proposed a saving of $1,000,000 in the amount annually expended for injuries and damages arising from the operation of the cars. This proposal during the oral argument was based upon the premise that many damage suits resulted from overcrowding the cars, and therefore, if the cars were not overcrowded, there would be fewer damage suits. Mr. Woods, for the commission, claimed great saving could be made here by preventing accidents from happening.

You may train the pedestrian and passenger public to become more careful for their lives and limbs, but courts know from common experience that accidents for which the law gives compensation happen from negligence. If it is the passenger or the passer-by who is negligent, they alone have to pay. The Commerce Commission, to save accidents, would force the plaintiff companies to relieve congested points; but congestion at street intersections has no connection necessarily with happening accidents. Excluding acts over which no one has control, every accident is due to some one's lack of care for his own or other's safety.

The city, in its brief, however, on this point insisted that the companies had accumulated $1,955,217.82 in an account to take care of accidents, and that that fund should be reduced by at least $1,000,-

000. This reserve fund to meet unliquidated claims and pending litigation was never the subject of evidence or discussion in the hearing before the commission, and we may therefore dismiss it. There has been introduced no evidence by the commission or the city of Chicago that the plaintiff companies, in their law department or accident department, have been lax in their work, or have made settlements of claims unlawfully.

[7, 8] There remains but one other item which the commission and the city of Chicago claim should be eliminated, namely, the item of $4,853,487 for renewals and depreciation. Depreciation has been well defined as "the loss in value of some destructible property over and above current repairs." Under the settlement ordinances with the city of Chicago, the plaintiff companies are authorized and required to set aside each year a certain percentage of gross receipts for renewals. At the end of the grant to the plaintiffs the city may either purchase the properties at the valuation fixed by the ordinances, or, if it grants the right to another company or companies to operate street railways in the streets of Chicago, such other companies shall take over the properties at the same price at which the city might have purchased them.

All of these ordinances were passed in pursuance of legislative authority. No provisions were made for sinking funds to retire bonded indebtednesses, or for amortizing the investment. The traction companies are required to maintain their properties in an adequate state of physical efficiency, and when various items of property can be no longer maintained, because worn out, to renew them. No authority need be cited to show that, if at the expiration of the grant these properties have decayed, and the fund provided by the city ordinances for renewals should not be on hand, that an abatement in the contract price could be secured by either the city of Chicago or any new licensee of the city.

The ordinances provide that the renewal fund, at the expiration of the grant, shall be turned over to the city or any purchaser. The Illinois Commerce Commission, therefore, has no power to prevent the setting aside of a fund representing depreciation, sufficient to take care of renewals as they may be needed from time to time. The right to set aside a depreciation fund is a property right, created for the benefit of the plaintiffs, and cannot be taken away by the state without their consent or due compensation made therefor. City of Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371. The record shows that the depreciation fund at present is over $2,000,000 short of what it should be.

[9] Counsel for the city of Chicago claim that, in estimating the net earnings of the plaintiffs to their shareholders, the 55 per cent. of the earnings due to the city of Chicago should be included. This argument hardly merits comment. The payment to the city might have been made in dollars or sprinkling or pavement of streets. It was compensation paid to the city of Chicago for use of its streets, and necessarily an overhead expense, to be paid before dividends or interest on the invested capital could be estimated. Venner v. Chicago City Railway Co. et al., 236 Ill. 349, 86 N. E. 266.

[10] The city of Chicago urged with great emphasis that the contracts between the plaintiffs and the city were entered into in 1908, that during that year and several years subsequently large returns were had by the stockholders, that the contract with the city should be taken as a whole, and that a minor return to-day to the present stockholders was a matter of no importance. Nothing was said of the stockholders in 1908, 1909, 1910, 1911, and 1912 who sold their stock on the basis of the then large earnings. This argument would make the present stockholders' sustain a loss of $5,000,000 a year because other and more fortunate shareholders, dead and gone, perhaps, received in the past a fair, or more than fair, return. To require the companies to-day to run at a loss, and say that all of the earnings of the companies during the entire contract period of operation should be equalized, is like trying to turn the mill wheel with water that has already run by.

[11] The commission and the city of Chicago both attempt to justify the 5-cent rate on the basis of the original contract ordinances. · It is claimed that the contract rate could not be impaired by the state or anybody. A complete answer to this may be found in the decision of the Supreme Court of Illinois in Chicago Railways Co. et al. v. City of Chicago, 292 Ill. 190, 126 N. E. 585, where a writ of error to the Supreme Court of the United States for revision was dismissed for want of jurisdiction. 256 U. S. ——, 42 Sup. Ct. 95, 66 L. Ed. ——. This question is foreclosed so far as this court is concerned.

If the Illinois Commerce Commission had the right, under the act of its creation, to order changes in operation of utilities, in this case it is aiming to accomplish its end by drastic and unlawful means. It is one thing to order (1) changes in routing of cars; (2) reduction in lay-over time to employees; (3) remodeling of accident and law department; (4) reduction of wages and labor; (5) deferring maintenance and renewals; (6) in fact, to order any variation of operation making for the public good. It is quite another thing, having in mind all of these benefits to the utilities and to the public, to say to the utilities we admit that it costs you over 6 cents to carry every passenger; we will, however, reduce your fare rate to 5 cents, and invite you to test out our opinion as to what improvements may be made in the internal operation of your own business.

The basis of the commission's action in this case is quite wrong. As outlined by its chairman, and urged by its counsel, supplemented by the corporation counsel for the city of Chicago, it affords no locus pœnitentiæ for the plaintiff railroads. No opportunity is given them to try out the urged reforms. They are told in advance that the medicine is good and that they must take it, whether they like it or not, irrespective of whether it has any therapeutic value. The orderly, rational, and legal method of procedure would have been for the commission to outline these various changes in management and operation, and invite the companies to put their suggestions in force, giving the companies an opportunity to demonstrate the benefits, or even the possibilities, of the order.

All of the changes suggested by the commission were matters of conjecture and opinion, and it is quite within the range of human thought that some of the changes could not be carried out to advantage, either to the companies or to the people. Why, then, should the Illinois Commerce Commission, discounting impossibility of performance, direct a rate which both it and the city of Chicago admit will not produce operating expenses, to prevail until their views are adopted. Too much commendation cannot be given to any public utilities commission for its interest in public affairs. It will always be forgiven if its enthusiam leads it to incidental legal excesses. It cannot, however, act arbitrarily to force its views without trial. The reduction of three cents in fare ordered by the commission would make a difference in the revenue of the companies of approximately $22,500,000 a year.

[12] Assuming, therefore, that the companies would be entitled to no more than 6 per cent. net return upon the property invested (the rate of return we do not pass upon) the defendants are required to show, excluding items of renewals, that a saving of over $17,000,000 could be made in operating expenses out of a present total of about $46,250,000. This presupposes, necessarily, that the plaintiff companies are presently grossly mismanaged. To determine whether a business is mismanaged, there is no better way than to compare its operating cost with other businesses of a similar character. In the absence of evidence that all businesses of the same nature are mismanaged, it seems fair to assume that a business whose operating costs compare favorably with others of like nature is properly conducted.

The only evidence before the commission on this subject was offered by the plaintiffs. This consisted of three tables of figures, one showing comparative costs per car hour between the plaintiff lines and the street railways of other cities; another showing comparative speeds of cars; and the third showing the comparative per cent. of gross income and the cost per 1,000 passengers carried for injuries and damages. From this evidence the court cannot escape the conclusion that the cost of operation of the plaintiff lines is lower per car hour than that of the traction companies in the other large cities of the country; that the average speed of plaintiffs' cars, excluding layovers, is the highest; and that the amounts expended in damage suits is the lowest, excluding Boston, where a large part of the railway system runs in subways and on elevated structures. With such evidence before us, we suggest that criticism should be fortified with convincing evidence, when charges are made of inefficient and wasteful management.

All of the defenses urged to the bill in this case are collateral to the real issue, and are treated here only because so strenuously urged. The pertinent fact charged in the bill, namely, that the 5-cent fare ordered by the Illinois Commerce Commission will not permit the plaintiff companies to earn money enough to pay for wages, power, and taxes, is unanswered by the record. In fact, the attorney for the commission stated during the oral argument that after putting all of the

proposed economies into effect there would be available a return of a little over 1 per cent. upon the invested capital.

An order may be prepared, enjoining, pending the final hearing of this cause, the enforcement of the commission's order as to rates, and unless the parties can agree upon some more satisfactory method, the companies will be required to issue transfer slips to the passengers, as heretofore ordered.

EVANS and PAGE, Circuit Judges. We concur in the foregoing opinion, both as to reasoning and result.