POTTER v. CALUMET ELECTRIC ST. RY. CO. et al.

CITY OF CHICAGO v. COBE.

(Circuit Court, N. D. Illinois, E. D.   February 8, 1908.)

No. 24,467.

1. STREET RAILROADS—FRANCHISES—CONTRACT—MODIFICATION.
   Where an ordinance granted a right to construct a street railroad on certain streets and avenues of a city, and provided that the railroad company should be liable for, and pay into the city treasury, $50, and no more, as an annual license fee for each and every car used by the company, a contract executed by the corporation and the mayor on behalf of the city, to induce the mayor to sign the ordinance, providing that the railway company should pay $50,000 in installments within 20 years for the right secured, constituted such a modification or amendment of the ordinance that both could not be executed as a whole.

2. MUNICIPAL CORPORATIONS—ORDINANCES—AMENDMENT—CONTRACTS.
   Under Chicago City charter, providing that an ordinance must be agreed to by the concurrence of a majority of all the members of a city council elect, and that the yeas and nays must be taken, and a rule that a city ordinance can only be amended or repealed by an act of equal dignity and formality, and not by a mere resolution, a contract between a street railway company and the mayor acting on the city's behalf, by which the railway company agreed to pay the city $50,000 to induce the mayor to sign a franchise ordinance, which contract was informally accepted by the city council and ordered filed, was ineffective as an amendment of the ordinance.

3. SAME—LICENSE TO USE STREETS—NECESSITY OF ORDINANCE.
   Ill. Const. 1870, art. 11, § 4, prohibits any law granting a right to construct a street railroad within a city without requiring the consent of the local authorities. Held that, though the right to construct a street railroad comes from the state as a "franchise," and the consent and designation of streets to be occupied comes from the municipality as a "license" or contract right, such license must be by ordinance of the city council passed by the yeas and nays concurred in by the majority of the members elect and approved by the mayor under the city's charter, providing that ordinances must be so adopted.

4. STREET RAILROADS—GRANT OF RIGHTS IN STREETS—"LOCAL·AUTHORITIES"
—"CORPORATE AUTHORITIES."

    Ill. Const. 1870, art. 11, § 4, prohibits the granting of a right to con-
struct a street railroad in a street without the consent of the "local au-
thorities" and street railway act (2 Starr & C. Ann. St. 1896, p. 2110, c.
66, par. 3) requires the consent of the "corporate authorities." *Held*, that
the terms "local authorities" and "corporate authorities" were synony-
mous, and used to indicate those representatives either directly elected
by the people or appointed in some mode to which the people had given
their assent.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Street Railroads,
§§ 69–76.

    For other definitions, see Words and Phrases, vol. 5, p. 4205; vol. 2,
pp. 1602–1603.]

5. MUNICIPAL CORPORATIONS—GOVERNMENTAL POWERS—GRANTING LICENSES.

    The granting of licenses to a street railway company to construct a
street railway in a street by a city is the exercise of governmental power,
in which the municipality acts as the agent or representative of the state,
and not in a private capacity.

6. STREET RAILROADS—GRANT OF RIGHTS IN STREETS—CONTRACTS—VALIDITY—
ESTOPPEL TO DENY.

    Where a street railway company, in order to induce the mayor of a
city to sign a franchise ordinance, executed a contract which was void in
its inception, by which the railway company agreed to pay the city $50,-
000 in installments for the rights granted under the franchise, and after
executing the contract the railway company proceeded to construct and
operate its road on one of the streets under a permit issued by the com-
missioner of public works pursuant to such franchise and contract, the
railway company was thereafter estopped to deny that the contract was
valid.

  Theodore J. Brundage, Corp. Counsel, and Charles M. Haff, Asst.
Corp. Counsel, for petitioner.

  Pam & Hurd, for receiver.

  SANBORN, District Judge. Petition for the payment by the re-
ceiver of the railway company of $18,000, claimed to be due under a
contract between the company and the city dated November 18, 1895.

  It appears from the petition that on November 11, 1895, the common
council of the city of Chicago adopted an ordinance granting the rail-
way company a license to extend its road over certain streets, on terms
common to such ordinances, as to the time of completion, manner of
construction, rates, term of grant, etc. It provided that the company
should pay an annual license fee of $50 per car and no more. The
mayor was unwilling to approve the ordinance without the company
would pay for the franchise, and, in order to induce his approval, the
company executed and filed with him a contract reciting the passage
of the ordinance by the council, and that the mayor was unwilling to
approve it without the same should provide for a compensation to be
paid to the city for the privileges under the ordinance granted by the
city to the company. It provides that in consideration that the mayor
shall approve the ordinance, and not return the same without his ap-
proval, the company covenants and agrees to pay $50,000 in certain
installments, running through a period of 20 years. It is further pro-
vided that, in default of any payment continuing for 90 days, all the
rights, privileges, and immunities of the ordinance granted shall at

once absolutely cease and determine, the ordinance thereafter having no further force or effect in favor of the company.

The ordinance grants the right to the company to build its roads on 24 streets and avenues, among them 103d street. It appears from the recitals of the contract that a prior license had been granted to the Englewood & Chicago Electric Street Railway Company May 2, 1893, giving that company the right to construct and lay one or more lines of railways on 103d street, between Vincennes avenue and Michigan avenue. The right to lay tracks upon 103d street between such points having been granted by the ordinance to the Calumet Company, and there being a question whether the Englewood Company had any prior right to construct a railroad on said street, it was provided in the contract that the Calumet Company would not construct or attempt to construct any tracks on 103d street without the consent and permission of the commissioner of public works, until it should first be judicially and finally ascertained and determined that the rights of said Englewood Company had lapsed and determined; but should the commissioner permit construction in said street by the Calumet Company before such adjudication, it was agreed that the company should remove its tracks upon any final judicial determination in favor of the Englewood Company; and in case said company should refuse to remove its tracks, the commissioner was authorized to do so.

The license to the Englewood and Chicago Electric Railway Company, referred to in the petition and contract, was dated May 2, 1893, and was accepted May 15, 1893. Section 3 provides that one track should be completed and in operation on 103d street (and certain other streets) within two years from the date when the ordinance should take effect; and that if the track was not so laid, and the road operated on such streets within two years, then the rights and privileges granted should, at the expiration of said time, as to any street not so built upon and the road so operated, wholly cease and determine, and revert and vest absolutely in the city. The road was not built on 103d street within the time limited. It was, however, a question of doubt whether the license to build had absolutely determined when the Calumet license was granted November 18, 1895. In Blocki v. People, 220 Ill. 444, 77 N. E. 172, Id., 123 Ill. App. 369, it was said that if the company fails to comply with the conditions of the ordinance as to the time of construction, without justifiable excuse, all its rights and privileges cease. In view of the question as to the prior rights of the Englewood Company in 103d street, the contract referred to was made to provide that the Calumet Company should not build in 103d street until it had been judicially and finally ascertained that the rights of the Englewood Company had lapsed and determined; but should the commissioner of public works permit construction by the Calumet Company before such adjudication, then the latter was to remove its tracks from that street upon any final judicial determination in favor of the Englewood Company.

On November 18, 1895, the same day that the ordinance in favor of the Calumet Company was finally adopted, the Englewood Company applied to the commissioner of public works for a permit to lay its tracks on a large number of streets, including 103d street, without giv-

ing any reason in the application for its delay. On December 11, 1895, the corporation counsel advised the issuance of a permit, except as to 103d street. In a communication to the commissioner, the corporation counsel stated that the Calumet Company claimed that the Englewood Company's rights as to 103d street had lapsed, and that the Calumet Company had made an agreement with the mayor that its own ordinance should not include 103d street unless the Englewood Company's rights should be found to have lapsed; and that the question must be determined by judicial proceedings. The communication further stated that it was possible that all the unexercised rights of the Englewood Company to lay tracks had lapsed, but this he regarded as not probable, because the city council had never attempted to declare any forfeiture of such rights, but, on the contrary, had on several occasions directed the Englewood Company to lay tracks on certain streets, thus clearly waiving the forfeiture. For these reasons he advised the issuance of a permit except as to 103d street. The Englewood Company thereupon executed an agreement that in consideration of the issuance of such permit it would not claim any waiver through the issuance thereof, beyond what existed prior to its issuance, and that it would promptly commence and diligently prosecute a mandamus suit, or other appropriate proceeding, to obtain a judicial determination as to its rights in 103d street; and that the city should not be estopped from asserting a forfeiture of all rights conferred on the Englewood Company by its ordinance in consequence of the issuing of the permit. Pursuant to the advice of the corporation counsel, and the contract just stated, a permit was issued as prayed for December 12, 1895, covering all streets except 103d. On November 19, 1895, the Calumet Company also requested a permit to construct its road in 103d street, under its ordinance. The corporation counsel on December 26, 1895, submitted a communication reciting the agreement of the Englewood Company to obtain a judicial decision as to its rights in 103d street, but stating that no such action had been taken by that company, and that he had reason to believe that none would be taken, at least in the near future. That there was a public demand for street car facilities in 103d street, under one of the ordinances. The communication then proceeds:

"I therefore advise that a permit be now granted to the Calumet Electric Street Railway Company to construct and maintain its tracks in the above mentioned portion of 103rd street, subject to the agreement which the Calumet Company made with the mayor November 18, 1895, and subject, also, to a further condition, to which said Calumet Company should be required to agree, that said Calumet Company shall not have, and will not at any time, nor in any way claim to have, against the city of Chicago in consequence of the issuance of the permit or of any privilege exercised or expenditure made under the permit, any new or further or increased right, privilege, exemption or waiver beyond what it may now have prior to such permit under its ordinances of November 11, 1895, and under its said agreement of November 18, 1895."

On March 10, 1896, the commissioner issued a permit, pursuant to the advice of the corporation counsel, to the Calumet Company, authorizing the construction of its road in 103d street. This permit contains the following provision:

"This permit is issued and accepted upon the condition that said work shall be done in accordance with and shall be maintained subject to all the condi-

tions, stipulations and requirements of the ordinance hereinbefore mentioned, to all orders and ordinances which have been or which may be passed by the city council pertaining to the same and to all orders of the commissioner of public works; and upon the further express condition that a certain agreement made by said company (and in consideration of the execution of which this permit is granted) shall be considered a part of this permit as fully to all intents and purposes as if the same were here copied at length."

The ordinance contained a provision that all tracks at all intersections of streets should be paved between the rails. The contract provided that this clause should be construed and made to read that all tracks at the intersection of streets should be paved between the rails and also between the tracks, wherever there should be two or more tracks at any street intersection. It will be noticed that the only provision in the contract which is directly antagonistic to the ordinance is the one in relation to 103d street. The other provisions of the contract are additional to those of the ordinance, so that both may stand together in all respects except that the rights of the company in 103d street are restricted to some extent. The company accepted the terms and conditions of the ordinance, and filed the bond required thereby in the sum of $50,000; and the company also constructed and operated an extension of its line of street railway, in accordance with the terms of the ordinance and contract, and has continued ever since to operate the road. At the time of filing the petition, October 15, 1907, the sum of $18,000 was due, pursuant to the contract, the company never having made any payment. A general demurrer was put in by the railway receiver. It is contended for the demurrer that the contract is void on several grounds, which may be summarized as follows: The mayor had no power to contract with the railway company. The council alone can decide the terms and conditions on which streets may be occupied, or compensation therefor provided. The council could not delegate to the mayor this discretionary power to fix the compensation. An ordinance cannot be amended by resolution, hence the mayor cannot amend an ordinance by agreement. The assent of the council in accepting the contract and placing it on file can operate with no greater force than a resolution, which would itself be void.

It is also contended that the provision in the ordinance, that the railway company "shall be liable for and pay into the treasury of the city of Chicago, for the use of said city, the sum of fifty dollars and no more, as an annual license fee for each and every car used by the said company," fixes the compensation for the license granted, so that the agreement to pay $50,000 for the license is totally inconsistent with the ordinance. There is no showing that the company ever did anything to recognize the validity of the contract except to take the permit to build in 103d street subject to the condition therein expressed, that the contract should be a consideration for the issuance of the permit. After the permit was issued it built the road in that street, and is still operating it; the Englewood Company never having brought any suit to test its rights under the ordinance granted to it.

Counsel for petitioner urge that the company took the benefit of

the contract first by accepting an ordinance which would not have been passed except for the contract, and next by accepting a permit expressly making the contract a consideration for its issue, and afterwards building and operating the road. They also contend that no ordinance was necessary for the purpose of licensing the company to build and operate the road, but that a mere resolution of the council not approved by the mayor was sufficient; and they say that the approval of the contract by the council, by placing it on file and ordering it of record, was equivalent to a resolution, binding the company and city alike. It is clear that the contract so modifies or amends the ordinance that both could not be executed as a whole. The contract materially modifies the ordinance as to 103d street, at least. I am not so clear whether the agreement to pay the $50,000 is not additional to, and consistent with, the license fee provided for in the ordinance. The latter is in the nature of a tax, based rather upon the value of the rights and privileges granted by the ordinance than a license fee, or exaction made under the police power. When the ordinance says that $50 per car, and no more, shall be paid, it would seem to mean that no further or other sum shall be imposed by way of regulation, under the police power of the city, not that a tax might not be agreed to, based on the agreed value of the rights granted. In the same way I take it that the 55 per cent. of net earnings provided to be paid to the city in the recent ordinances affecting the Chicago City Railway Company and the Railways Company, is exacted as a tax, ad valorem, and not as an exercise of the police power to regulate street railways. As to the distinction between a license fee and a tax, see Wisconsin Tel. Co. v. Milwaukee, 126 Wis. 1, 104 N. W. 1009, 1 L. R. A. (N. S.) 581, 110 Am. St. Rep. 886, Nunnemacher v. State, 129 Wis. 190, 220, 108 N. W. 627, 9 L. R. A. (N. S.) 121, and Partington v. Attorney General, L. R. 4 H. L. Cas. 122. Assuming, however, that the ordinance and contract are entirely inconsistent, and cannot stand together, the question arises whether the contract can be sustained, not having been authorized in the manner required for the adoption of ordinances. The charter provides that an ordinance must be agreed to by the concurrence of a majority of all the members elect, and that the yeas and nays must be taken. Neither one of these formalities was observed, hence the informal action of the council in accepting the contract and placing it on file cannot be regarded as equivalent to the requirements in respect to ordinances. It is settled law in Illinois that an ordinance can only be amended or repealed by an act of equal dignity and formality, and not by a mere resolution. People v. Mount, 186 Ill. 560, 58 N. E. 360; Hope v. City of Alton, 214 Ill. 102, 73 N. E. 406; People v. Latham, 203 Ill. 9, 67 N. E. 403; B. & N. Ry. Co. v. City of Bloomington, 123 Ill. App. 639; City of Paxton v. Bogardus, 201 Ill. 628, 66 N. E. 853; Hibbard & Co. v. City of Chicago, 173 Ill. 91, 50 N. E. 256, 40 L. R. A. 621; City of Joliet v. Petty, 96 Ill. App. 450.

It clearly appears, however, that the mayor and council were satisfied with the modification of the ordinance made by the contract.

The amendments were beneficial to the city, and in its interest; and the company was satisfied to contract to pay the $50,000, and build in 103d street under the express conditions of a permit making the contract a consideration for its issuance. Under these circumstances the contract should be sustained unless it is plainly void, and also if the company has waived its invalidity, if it was at first invalid.

Coming now to the question whether the council might grant the license to build and operate the road by a resolution, it seems clear that this was one of the subjects which required an ordinance, with the concurrence of the mayor; and that, if the contract had been brought to the test before the road was built, it would have been held void. Section 4 of article 11 of the Illinois Constitution of 1870 provides that no law shall be passed by the General Assembly granting the right to construct and operate a street railroad within any city, town, or incorporated village, without requiring the consent of the local authorities having control of the street or highway proposed to be occupied by such street railroad. The right to construct comes from the state as a franchise, while the power to consent, and designate the streets to be occupied, comes from the municipality as a license or contract right. In Chicago City Ry. Co. v. People, 73 Ill. 541, which involved the validity of an ordinance passed in 1871, after the Constitution of 1870 took effect, it was held that the right granted by the city to construct the road was a license as distinguished from a franchise derivable from the state, and not, therefore, within the constitutional prohibition against local laws granting to any corporation, association, or individual the right to lay railway tracks, or granting any special or exclusive privilege, immunity, or franchise whatever. This case has been approved in Metropolitan City Ry. Co. v. Chicago W. D. Ry. Co., 87 Ill. 317, Belleville v. Citizens' Horse Ry. Co., 152 Ill. 171, 185, 38 N. E. 584, 26 L. R. A. 681, Blocki v. People, 220 Ill. 444, 77 N. E. 172, Id., 123 Ill. App. 369, and other Illinois cases, and is followed in Blair v. Chicago, 201 U. S. 400, 459, 26 Sup. Ct. 427, 50 L. Ed. 801. The city being thus only authorized to consent to the laying of the tracks, and having only the power to make a license, revocable until acted upon, may not such action be evidenced by a mere resolution, without the consent or concurrence of the mayor? This question is answered by a consideration of the immense importance of the action of the city, and the very valuable, extensive, and permanent rights subject to its disposal. No better evidence could be had of the value of these rights than appears in the Blair Case, just cited, involving the rights of the city as to the Union Traction system, and from the fact that the city has reserved, in the recent street railway ordinances, 55 per cent. of the net earnings of its principal surface railway systems, as a remuneration for the grant of such licenses. The Supreme Court, in the Blair Case, calls this power of the city "The important and far-reaching authority of fixing by contract * * *. the term during which the occupancy shall continue." Page 462, of 201 U. S., page

441 of 26 Sup. Ct. (50 L. Ed. 801). In view of the general rule that a city must exercise its legislative powers by ordinance, and wherever a permanent rule of conduct is established, or the act is one of continuing force, no doubt exists that street railway licenses or contracts must be by ordinance, passed by the yeas called, concurred in by a majority of the members elect, and approved by the mayor. Village of Altamont v. B. & O. S. W. R. Co., 184 Ill. 47, 56 N. E. 340. Force is added to this view by the act of March, 1867, referred to in the Blair Case, providing that in Chicago no grant to use the streets should be given, unless by vote of three-fourths of the aldermen elected, and no grant extended until within a year from its expiration, and, in case of a. veto by the mayor, such grant should receive the vote of three-fourths of all the aldermen. This legislation clearly recognizes the necessity of an ordinance in such cases.

The argument requiring an ordinance, and the concurrent action of mayor and council, is strengthened by the use of the term "local authorities" in the Constitution, and "corporate authorities" in the street railway act. Chapter 66, par. 3, 2 Starr & C. Ann. St. 1896, p. 2110. These terms seem to be synonymous. The corporate authorities of a municipality are those representatives who are either directly elected by the people, or appointed in some mode to which they have given their assent. Wilson v. Trustees, 133 Ill. 443, 27 N. E. 203; People v. Knopf, 171 Ill. 191, 49 N. E. 424. Mayor and council being elective officers, both should concur in an ordinance granting a street railway license, otherwise the local authorities chosen by the people are not fully representative. And the granting of such licenses being the exercise of governmental or central power, in which the municipality acts as an agent or representative of the state, and not in its private capacity, there is all the more reason for requiring an ordinance in such cases. As to its authority over streets the city is a subordinate instrumentality of the state, and their control is a governmental function. Simon v. Northrup, 27 Or. 487, 40 Pac. 560, 30 L. R. A. 171; Kaukauna El. Lt. Co. v. Kaukauna, 114 Wis. 327, 89 N. W. 542; Pumphrey v. Baltimore, 47 Md. 145, 28 Am. Rep. 446; St. Paul v. M. & St. P. R. Co., 63 Minn. 330, 63 N. W. 267, 65 N. W. 649, 68 N. W. 458, 34 L. R. A. 184; Philadelphia v. Field, 58 Pa. 320; Woodruff v. Catlin, 54 Conn. 277, 6 Atl. 849; State v. Williams, 68 Conn. 131, 35 Atl. 24, 48 L. R. A. 465; affirmed in Williams v. Eggleston, 170 U. S. 304, 18 Sup. Ct. 617, 42 L. Ed. 1047; Agawam v. Hampden Co., 130 Mass. 528; Prince v. Crocker, 166 Mass. 347, 44 N. E. 446, 32 L. R. A. 610; Hall v. Concord, 71 N. H. 367, 52 Atl. 864, 58 L. R. A. 455; Smart v. Johnston, 17 R. I. 778, 24 Atl. 830; City Ry. Co. v. Citizens' St. Ry. Co., 166 U. S. 557, 17 Sup. Ct. 653, 41 L. Ed. 1114; City of Knoxville v. Africa, 77 Fed. 501, 23 C. C. A. 252. It seems undeniable, therefore, that if the contract in question had been questioned before the road was built it must have been held invalid. But the road has been built and is in operation. The company took its permit to build in 103d street in consideration of its having made

the contract. Can it or its receiver now be heard to say that it is not bound, and that the contract is void? I think the case is governed by City of Quincy v. C., B. & Q. R. Co., 92 Ill. 21. In that case a grant by resolution was made to a steam railroad to occupy a street, and pursuant to the resolution a deed of the rights secured by the resolution was made by the city to the company, followed by the building of the road and long user. The city then brought ejectment, claiming that the right could not be granted by a resolution, but the court sustained the company. This case has been regarded in subsequent ones not as authorizing the making of licenses to railroads to build in the streets by resolution, but only as sustaining the doctrine of estoppel. C. & N. P. R. Co. v. Chicago, 174 Ill. 439, 447, 51 N. E. 596; Village of London Mills v. White, 208 Ill. 289, 296, 302, 70 N. E. 313. The last case holds that a resolution granting the use of the streets to the owner of a telephone line cannot be revoked after the line has been built. In the White Case, commenting on the city of Quincy Case, the court say: "It is true that this court treated the deed as aiding a resolution, when the deed could only have been authorized by the resolution, so that in the end the legality of the grant depended upon the resolution itself, and upon acts done and permitted by the city which were in pursuance of the resolution. It is argued in the case at bar that this case should not hold that such a grant can be evidenced by resolution and made binding by acts done and permitted because then the veto power cannot be exercised. The same objection existed to the action of the city council in the Quincy Case. There was nothing upon which veto could operate in that instance." These decisions seem to me to be applicable and to authorize the conclusion that the contract may, at this time, be regarded as a valid one. The company offered the contract to the city in order to obtain the ordinance. The mayor fully exercised his prerogative by vigilantly guarding the interests of the public. Without objection or protest, though in an informal way, the council approved his action. Afterwards the company accepted a permit to build part of its road expressly in consideration of its having executed and delivered the contract which its receiver now seeks to avoid, and built and operated the road. In view of these facts the contract should be held valid, as was done in the Quincy Case. Other Illinois cases apply a liberal rule against disturbing informal municipal contracts after rights under them have become vested.

Condemnation proceedings were commenced by the city of Chicago for the purpose of widening the river to secure to the city the right of swinging a bridge over the property of the Norton Milling Company; while these proceedings were pending, an agreement was made between the mayor and commissioner of public works of the city with the milling company, giving to the city the right to swing the bridge over the premises of the milling company, and the city in consideration thereof agreed to build a vault under the street and to permit the company to put certain of its machinery therein

and store coal there. The vault was built by the city and taken possession of by the company. Subsequently, in an action brought by the company against the city for injuries to the vault, the city contended that the contract was invalid, the mayor and commissioner of public works having no authority to enter into the same on behalf of the city. Held, that the contract was not ultra vires the city, and the city having acquiesced in the arrangement made it was bound by the contract. City of Chicago v. Norton Milling Co., 196 Ill. 580, 63 N. E. 1043. A like ruling was made in Gregsten v. Chicago, 145 Ill. 451,[1] where plaintiff had built a vault in a street pursuant to informal authority from a city officer. In Rich v. Trustees, 158 Ill. 242, 41 N. E. 924, the case of the right or interest of a school district under a transaction claimed to be unlawful was presented. The district took from one of its own directors a deed for a school site, and expended money in improving it. The district brought suit to correct a mistake in the deed, but the defense was urged that the deed was void. Held that, though the transaction may have been unlawful, and not enforceable while executory, yet, after execution, a court of equity would not treat it as void. The case of Chicago Gen. Ry. Co. v. Chicago, 176 Ill. 253, 52 N. E. 880, 66 L. R. A. 959, 68 Am. St. Rep. 188, is also in point. A contract by ordinance between the city and a street railroad provided that the company should pay a license fee on each car, and an annual tax on each mile of track. The court say:

"We are also of the opinion that, even though it might be held that the condition upon which the permit or license was granted to the defendant railway company was ultra vires, the city not having the power to impose it, nevertheless the ordinance having been accepted by the company with the condition attached, agreeing thereby to perform it, it became a valid contract between it and the city, the validity of which the defendant is now estopped to deny. The act of the city in imposing the condition cannot be treated as against public policy or prohibited by statute, and void, and therefore, having accepted the contract in its entirety and enjoyed the benefits for which it agreed to pay the amount prescribed, it cannot now repudiate that contract."

To same effect, People v. Suburban R. Co., 178 Ill. 594, 53 N. E. 349, 49 L. R. A. 650.

The principle of these cases is that ultra vires municipal contracts bind the opposite party after benefits under them have been received by such party.

The demurrer is overruled.