**HARRIS TRUST & SAVINGS BANK v. CHICAGO RYS. CO. et al.**

No. 6839.

District Court, N. D. Illinois, E. D.

July 16, 1929.

Henry S. Robbins, of Chicago, Ill., for Orville E. Babcock and others.

Tenney, Harding, Sherman & Rogers, of Chicago, Ill. (Horace Kent Tenney, of Chicago, Ill., of counsel), for Harris Trust & Savings Bank.

Harold Smith, of New York City, and Sidney C. Murray, of Chicago, Ill., for Westinghouse Electric & Manufacturing Co.

Charles S. Babcock, of Chicago, Ill., for Chicago Railways Co.

Weymouth Kirkland and James M. Sheean, both of Chicago, Ill., for receivers of Chicago Railways Co.

David O. Dunbar and Daniel J. Schuyler, both of Chicago, Ill., for trustee under consolidated mortgage.

Edwin H. Cassels and David O. Dunbar, both of Chicago, Ill., for trustee under purchase-money mortgage.

Pam & Hurd, of Chicago, Ill., for trustee under income adjustment mortgage.

Samuel A. Ettelson, Corp. Counsel, of Chicago, Ill., for City of Chicago.

WILKERSON, District Judge.

The questions raised by the various motions which were set for hearing and disposition on June 25th are so interrelated, and the arguments upon said several motions covered so wide a field (comprehending steps taken and orders entered from the very inception of the receivership proceedings), that it seems desirable to file this memorandum stating the conclusions of the court and the reasons therefor.

The motions argued on June 25th and June 26th were as follows:

(1) Motion made by the city of Chicago on December 20, 1928, to strike from the files a petition of Orville E. Babcock et al., filed December 7, 1928, without leave of court.

(2) Motion made January 28, 1929, for leave to file an amendment to the petition of Orville E. Babcock et al., filed on the 7th day of December, 1928, and for the relief prayed in said petition as amended.

(3) Motion made April 1, 1929, for disposition of petition of Harris Trust and Savings Bank, plaintiff, for payment of 10 per cent. on the principal due upon the first mortgage bonds in addition to payments of interest heretofore ordered.

During the course of the oral arguments, the court made disposition of the city's motion to strike the petition filed without leave on December 7, 1928, and also of applicants' motion for leave to file an amendment to said petition so filed on December 7, 1928, by directing the entry of an order in the following form:

"The motion of the City of Chicago to strike from the files the document designated as 'petition' filed herein on December 7, 1928, without leave of this Court is denied and leave is granted to the persons designated as 'petitioners' therein to be heard for the purposes and under the limitations indicated in the opinion of the Circuit Court of Appeals for the Seventh Circuit in the matter of Petition for Writ of mandamus of Orville E. Babcock, William F. Prindle, Robert J. Dunham, Henry C. Edmonds and Mahlon D. Thatcher, individually and as a protective committee for Owners of Series 1 Certificates of the Chicago Railways Co., filed March 6, 1928. 26 F.(2d) 153. And leave is granted to Orville E. Babcock et al. to file their

amendment to petition filed Dec. 7, 1928, and to be heard thereon for the purposes and under the limitations indicated in said opinion of the Circuit Court of Appeals in said mandamus proceeding."

As indicated during the colloquy with counsel which preceded the entry of the foregoing order, the view of the court was and is that the order suggested by the court and thereafter entered during the oral arguments will be fully protective of the rights and interests of all parties, and will also be in harmony with the prior record in these proceedings, which is as follows:

The petition to intervene of Orville E. Babcock et al., which was presented to this court on July 13, 1927, bears notation showing such presentation on said date, and, also bears the filing mark of the clerk showing that the same was filed on November 8, 1928. Following the return of said document to counsel for petitioners in accordance with the ruling of this court denying leave to file said petition, application was made to the Circuit Court of Appeals for writ of mandamus; and on March 6, 1928, the Circuit Court of Appeals delivered an opinion and entered an order which directed the District Judge to grant leave to Orville E. Babcock et al. to file their petition for intervention and to permit petitioners to intervene in these proceedings for the purposes and under the limitations indicated in the opinion of the Circuit Court of Appeals.

Following the denial of petition for rehearing by the Circuit Court of Appeals, there were filed in this proceeding certified copies of the opinion and orders of the Circuit Court of Appeals, and thereupon the solicitors for the trustees under the first, the consolidated, and purchase-money mortgages served notice upon the solicitor for Babcock et al., and upon the solicitors for all other parties to the proceedings, that on a designated date they would "present for entry an order in accordance with the decision of the Court of Appeals." A copy of the proposed order was served with such notice; and on June 19, 1928, this court entered an order whereby Babcock et al. were "granted leave to file in this consolidated cause their petition for intervention which was heretofore presented for filing and which the Clerk was directed to return to counsel for said applicants, in an opinion of this Court filed herein on November 3, 1927, 23 F.(2d) 192, and said petitioners are hereby permitted to intervene herein for the purposes and under the limitations indicated in the opinion of

the Circuit Court of Appeals, in accordance with the judgment of that Court."

Between June 19 and November 8, 1928, Babcock et al. did not avail themselves of the leave thus given them; but manifestly they were within their rights in filing on November 8, 1928, the petition which they were given leave to file by the order entered June 19, 1928. In view of the statement of counsel for Babcock et al., "My contention is that this paper (referring to paper filed December 7, 1928) is a paper that we are entitled to file under the decision of the Circuit Court of Appeals," it seems equally manifest that the filing of the second petition and the amendment thereto should be (as is stated in the order entered during the oral argument) for the purposes and under the limitations indicated by the "decision of the Circuit Court of Appeals" upon which counsel bases his contention.·

Upon the entry of the above-quoted order during the course of the oral argument, and under the leave granted by such order, the amendment to the petition of December 7, 1928, was filed, and thereupon the court proceeded to hear counsel for interveners upon the merits of the relief prayed for in the said ·petition as amended, upon the statement of counsel for interveners that all the matters as to which he asked relief at this time are matters of record in these proceedings. The relief sought was stated by counsel for interveners, following his summarization of the contents of the petition as amended, to be as follows:

"Mr. Robbins: If the Court please, as you will have observed, there are three grounds of relief sought in this amended petition; first, that the receivers be required to cease paying the 55 per cent to the city; second, that the now $11,000,000 or more in the reserve and depreciation fund, so-called, be applied to the first mortgage to the end that the estate may be saved the difference between the small interest that the banks pay and the—

. "The Court: —and the five per cent.

"Mr. Robbins: Yes. And it is proposed that that be done as any live corporation would do it, by seeking in the market the bonds that can be bought cheapest. I assume that this court in the management of its receivers has the same powers in that respect as a corporation would have if it were run as a corporation. .

"The third ground of relief concerns the putting of a valuation on the property for the purposes of reorganization.

"Underlying all three of those questions is the one question whether the ordinance has expired. If ·it has expired, then, certainly, this court has no power to give away the property in the hands of the receivers as it is doing if there is no power in the court to pay that 55 per cent."

Taking up these three grounds in the order stated:

First. That the receivers be required to cease paying the 55 per cent to the city:

The argument of interveners is that, with the expiration of the grant made by the ordinance of February 11, 1907, and reaffirmed with modifications by the ordinance of November 13, 1913, *all* rights, duties, and obligations between the grantor city and the grantee railway absolutely ceased and determined on February 1, 1927. With this contention the court does not agree, for the reason that the city ordinances above referred to and the act of the Illinois Legislature on May 18, 1903 (commonly known as the Mueller Law, Illinois Statutes [Cahill's Rev. St. 1927], c. 131a, pars. 8–13), in pursuance of which these ordinances were adopted, seem to the court to manifest a clear intention not only to provide terms and conditions covering the city's consent to the use of city streets *during the grant,* but also to provide assurance, legally obligatory on the city, for the protection of the investment *"at and after"* as well as *"during"*. the term expiring February 1, 1927. To accept the argument on behalf of interveners the court would be obliged to hold that with the arrival of·February 1, 1927, the city was at once absolved from the obligation contained in section 23 of the 1907 ordinance that "in case such reserved right of purchase be not exercised by the said City or its licensee and the City shall grant a right to another company to operate a street railway in the streets and parts of streets constituting the said street railway system of the Company, such new company shall be required to and shall purchase and‹ take over the said street railways, property and rights of the Company at or after February 1, A. D. 1927, upon the same terms upon which the said City might then purchase and take them over."

Paragraph·2 of the petition filed by interveners on December 7, 1928, is identical with paragraph 23 of their petition filed November 8, 1928. These paragraphs quote a part of section 20, a part of section 22, and all of section 23 of the 1907 ordinance; and in said section 23 appears the above-quoted provision which the court construes as a binding

obligation on the part of the city entered into under the specific authority conferred upon the city by section 1 of the Mueller Law (Illinois Stat. [Cahill's Rev. St. 1927] 131a, par. 8), as follows:

"It shall be lawful for any such city to incorporate in any grant of the right to construct or operate street railways a reservation of the right on the part of such city to take over all or part of such street railways, at or before the expiration of such grant, upon such terms and conditions as may be provided in the grant; *it shall also be lawful to provide in any such grant that in case such reserved right be not exercised by the city and it shall grant a right to another company to operate a street railway in the streets and parts of streets occupied by its grantee under the former grant the new grantee shall purchase and take over the street railway of the former grantee upon the terms that the city might have taken it over."*

That the ordinance of 1907 was intended to constitute such a valid obligation on the part of the city seems apparent from the caption which precedes section 23 of the ordinance which reads as follows:

*"Rights of company in case city does not purchase for twenty years."*

In fact, the argument of counsel for interveners seems to take this same view as to the binding obligation *on the city* of said section 23, when he says:

"Now, what does that mean in this case? Of course, the purpose was to prevent an unjust confiscation of the property. The purpose was to enable those who were willing to give their money to extend and build and develop the street car system of Chicago an assurance that their money would come back to them, that they would be fairly treated."

But the court cannot accept the argument that the properties in judicial custody in this proceeding can be given the protection against "unjust confiscation" which this section 23 affords without accepting the corollary that the properties thus protected are preserved as the going entity described in such section 23 as "the said street railway system of the Company," which comprises, in the language of said section 23, "the said street railways, property and rights of the Company."

The ordinance of 1907 was reaffirmed, with modifications, by the unification ordinance and operating agreement made part of such ordinance; and such reaffirmation and modification became operative after submission to and approval by "the stockholders of the respective Companies, including depositaries of stock and the holders of participation certificates, as and in the manner provided or required by law, the by-laws of the respective companies and any agreements governing the holding or voting of the stock or participation certificates or shares of the companies, or any of them."

But, even if it were assumed that the caption to section 23, *"rights of the company in case city does not purchase for twenty years,"* is entirely meaningless, and that on February 1, 1927, *all* rights, duties, and obligations owed by or to the city with reference to the street railway properties absolutely ceased and determined, still the court would feel constrained to deny the first ground of relief prayed by interveners that "the Receivers be required to cease paying the 55 per cent to the City" for the reasons following:

When the street railway properties were taken into judicial custody on December 15, 1926, this court, in the order appointing the receivers, ordered and directed them "to take up with the representatives of the other street railways which are now being operated in co-ordination with the properties of the Chicago Railways Company as part of the unified system which is designated 'Chicago Surface Lines' the question whether, and if so, in what manner, there may be provided for the patrons of street railways in the City of Chicago, after February 1, 1927, unified operation of all surface street railways in the City of Chicago; and to make report to the Court of the results of such negotiations together with application for instructions concerning the operation of said system of street railways and property after February 1, 1927."

Pursuant to the directions given in the order of December 15, 1926, the receivers filed, on January 27, 1927, their petition for instructions, which set forth fully the steps taken by them with the representatives of other street railway properties which are being operated in co-ordination with the properties of Chicago Railways Company, and also with the representatives of the city to the end that "the status quo of the City and the Companies and their properties might be preserved temporarily and without prejudice or advantage because of the expiration by limitation, on February 1, 1927, of the Ordinances and the Operating Agreement under and pursuant to which there is now provided unified service."

In this petition for instructions there was set forth in full an ordinance passed by the city council on January 26, 1927, entitled "An ordinance granting a day-to-day permit for the unified operation of street railways in the City of Chicago."

In the order entered on said petition for instructions one of the directions to the receivers was:

"To make payment to the City of Chicago, on or before the 10th day of April, 1927, of the amount determined and certified by audit and report of Lawrence Scudder and Company, Certified Public Accountants, as compensation for the year ending January 31, 1927, for the use of City streets by Chicago Railways Company and by the Receivers, computed in the manner provided in the ordinance grants to Chicago Railways Company."

On July 19, 1927, the receivers made report, among other things, "concerning passage of an ordinance by the City Council of the City of Chicago on July 13, 1927, entitled 'An Ordinance consenting to further day-to-day, but not longer than November 30, 1927, unified operation of street railways in the City of Chicago,'" which ordinance was set forth in full in the report. Such ordinances specified the terms and conditions of the city's consent to further operation of street railways in streets and public places, and provided that "continuance of street railway operation, after July 31, 1927, in streets and public places in the City of Chicago, shall constitute acceptance by the said companies other than Chicago Railways Company and by the Receivers of said Chicago Railways Company of all the terms and conditions upon which this consent is given by the City of Chicago, unless and until said companies and/or said Receivers affirmatively evidence their nonacceptance of the said terms and conditions by the filing of written notice with the City Clerk of the City of Chicago or by otherwise affirmatively evidencing such nonacceptance."

All parties to the proceeding being in court on July 19, 1927, and their suggestions having been asked on that day and on July 20, 1927, concerning the several administrative problems arising out of the facts set forth in the receiver's report presented on July 19, 1927, the court, by order entered July 20th, among other things, directed the receivers "to continue, until the further order of this Court, the operation of the street railway system of Chicago Railways Company, after July 31, 1927, in streets and public places in the City of Chicago."

Shortly before the entry of this order, namely, on July 14, 1927, this court heard the arguments on the original motion of these interveners for leave to intervene. During the course of such arguments the following colloquy occurred, as appears from the transcript of the proceedings of July 14, 1927, and brought to the attention of the court as part of the oral argument of Mr. Tenney on June 26:

"Mr. Robbins: You will be asked next week to extend that four months more on the same terms. I have nothing to say about that. I see no reason why, if the City desires to continue receiving its 55 per cent during the life of this new Ordinance—

"The Court: Suppose the City says you cannot remain in the streets and you quit operating. How can you pay them 55 per cent?

"Mr. Robbins: Now that is all bugaboo—. The City is not going to turn you off the streets under the ordinance of 1913; the City cannot.

"The Court: What is your view about the 55 per cent? Do you think the City should be paid that?

"Mr. Robbins: I don't care about that. That is a matter that I don't care about. I submit and my people submit to the wisdom of your Honor on the question of the 55 per cent being in harmony with this ordinance."

When the time approached for payment of compensation for the use of city streets by the receivers for the period from February 1, 1927, to January 31, 1928, the record shows that on March 28, 1928, there was served on counsel for interveners, after the delivery of opinion and entry of order by the Circuit Court of Appeals, as well as on counsel for all other parties, copy of report and petition for instructions by the receivers with reference to the payment of compensation for the use of city streets for the year ending January 31, 1928, together with notice that such report and petition would be presented to the court for consideration on March 30, 1928, and that order thereon would be suggested in the form shown in draft attached to such notice. In said report and petition for instructions by the receivers, the court was advised of the passage by the city council of sundry thirty-day ordinances all identical with the ordinance reported to the court on July 19, 1927, in so far as such thirty-day ordinances stated the terms and conditions of the city's consent to the occupancy of city streets by street railways; and upon April 2, 1928, the court entered order recit-

ing notice to all parties and to counsel for interveners which authorized and directed the receivers:

"1. To make payment to the City of Chicago on or before April 10, 1928, of the sum of One Million Five Hundred Sixty-two Thousand Seven Hundred Fourteen Dollars and Sixty-eight Cents ($1,562,714.68) as compensation for the year ending January 31, 1928, for the use of City Streets by the Receivers.

"2. To continue, until the further order of this Court, the operation of the properties which are in judicial custody herein upon and subject to the terms and conditions specified in the order entered herein on July 20, 1927."

The printed record also shows that, after this court had entered formal order after due notices to counsel for interveners, which granted leave to intervene in accordance with the order of the Circuit Court of Appeals, the case was set down for hearing on July 10, 1928, after notice to counsel for interveners as well as to counsel for all parties of record. On such hearing the city introduced the various short-term ordinances whereby the city consented to further day-to-day operation of street railways in streets and public places upon terms and conditions stated in such consents. Notwithstanding the leave given by this court on June 19, 1928, interveners offered no evidence on the hearing which began on July 10, 1928, and which concluded with the entry of decree on July 18, 1928, which contained the following provisions:

"The Receivers are also directed to pay, so long as the property of the Chicago Railways Company remains in their custody and is operated by them, whatever sums may become due to the City of Chicago as compensation for the use of the City's streets, computed and payable at the time and in the manner provided in the Operating Agreement, dated December 22, 1913, and the Ordinance authorizing the said Agreement, which are annexed as Exhibit 'D' to the Bill of Harris Trust and Savings Bank, Trustee herein. The Court reserves jurisdiction to make, upon application of any of the parties hereto, and due notice to the other parties, such further determination with reference to this matter as it may upon further hearing deem necessary or proper."

These steps in these proceedings are cited because of their relevancy to what Mr. Justice Brandeis refers to in the case of United States v. California Co-operative Canneries, 279 U. S. 553, 49 S. Ct. 423, 424, 73 L. Ed. 838, decided May 20, 1929, as "the settled rule of practice that intervention will not be allowed for the purpose of impeaching a decree already made."

In support of his statement that such is "the settled rule of practice," Mr. Justice Brandeis appends note 1, which reads:

"See Forbes v. Railroad, Fed. Cas. No. 4,926; Coffin v. Chattanooga Water & Power Co. (C. C.) 44 F. 533; Lombard Investment Co. v. Seaboard Mfg. Co. (C. C.) 74 F. 325, 327; Land Title & Trust Co. v. Asphalt Co. of America (C. C.) 114 F. 484; State Trust Co. v. Kansas City, etc., Co. (C. C.) 120 F. 398, 407, 408. This rule of practice is embodied in Equity Rule 37. See Hutchinson v. Philadelphia & G. S. S. Co. (D. C.) 216 F. 795; Hopkins v. Lancaster (D. C.) 254 F. 190; Cauffiel v. Lawrence (D. C.) 256 F. 714; King v. Barr (C. C. A.) 262 F. 56; Mueller v. Adler (C. C. A.) 292 F. 138; In re Veach (C. C. A.) 4 F.(2d) 334; Union Trust Co. v. Jones (C. C. A.) 16 F.(2d) 236; Board of Drainage Com'rs v. Lafayette Bank (C. C. A.) 27 F.(2d) 286. Compare Farmers' Loan & Trust Co. v. Kansas City R. R. (C. C.) 53 F. 182, 186; United States v. Northern Securities Co. (C. C.) 128 F. 808; Horn v. Pere Marquette R. R. (C. C.) 151 F. 626, 634; United States v. McGee (C. C.) 171 F. 209; Jennings v. Smith (D. C.) 242 F. 561, 564; Adler v. Seaman (C. C. A.) 266 F. 828."

But, if the interveners' first ground for relief be treated as an application now made under the jurisdiction reserved by the decree of July 18, 1928, "to make, upon application of any of the parties hereto, and due notice to the other parties, such further determination with reference to this matter as it may upon further hearing deem necessary or proper," the court is still constrained to deny such relief. Counsel for interveners admitted during the oral argument that the city had the right to exact "reasonable compensation" for the use of city streets, but stated that he had formed no opinion and had no evidence to offer as to what would constitute "fair compensation." That the city has the right to exact compensation for the use of city streets by street railways is settled law in Illinois. Such compensation may be either by way of a fixed sum per car operated, as in the case of Byrne v. Chicago General Ry. Co., 169 Ill. 75, 48 N. E. 703, 705, where it is said at page 83: "The material point here decided is that the use of the streets in the cities of this state by street-car companies is subject to the consent of the common council, and that, in granting such consent, the

common council may impose such conditions as, in its opinion, the public benefit may require. Under the constitution, not even the legislature has the power to grant the right to construct and operate a street railroad within a city without the consent of the common council. Section 4 of article 11 of the constitution is as follows: 'No law shall be passed by the general assembly granting the right to construct and operate a street railroad within any city, town or incorporated village, without requiring the consent of the local authorities having the control of the street or highway proposed to be occupied by such street railroad.' "

—or such compensation may be based on the lineal mileage of street railway tracks, as in Chicago General Railway Co. v. Chicago, 176 Ill. 253, 52 N. E. 880, 66 L. R. A. 959, 68 Am. St. Rep. 188; or on some percentage of the operating receipts, as in Venner v. Chicago City Railway Co., 236 Ill. 349, at page 363, 86 N. E. 266, 271, in which case a stockholder of Chicago City Railway attacked the validity of the ordinance requiring payment to the city of 55 per cent. of the divisible net receipts, wherein it was said:

"The law is clear that the city of Chicago has the right to exact compensation from street railway companies occupying its streets with their railroads for the privilege of so doing (Lobdell v. City of Chicago [227 Ill. 218, 81 N. E. 354], supra), and the fact that the city is to receive 55 per cent. of the net earnings of said Chicago City Railway Company during the term that it shall occupy the streets of the city of Chicago with its tracks, under the ordinance of February 11, 1907, does not make the city of Chicago and the Chicago City Railway Company partners in the operation of said street railway system."

In Chicago Railways Co. et al. v. Illinois Commerce Commission et al. (D. C.) 277 F. 970, at page 979, a specially constituted Court, consisting of District Judge Carpenter and Circuit Judges Evans and Page, said:

"The payment to the city might have been made in dollars or sprinkling or pavement of streets. It was compensation paid to the city of Chicago for use of its streets, and necessarily an overhead expense, to be paid before dividends or interest on the invested capital could be estimated. Venner v. Chicago City Railway Co. et al., 236 Ill. 349, 86 N. E. 266."

See, also, the reasoning and conclusion of Judge Sanborn in Potter v. Calumet Electric St. Ry. Co. (C. C.) 158 F. 521, wherein

the receiver of the street railway company endeavored to escape any payment for the right to operate on 103d street beyond the payment provided in the city ordinance, and wherein the receiver was held liable for an additional sum provided for in a contract which recited that such additional payment would be made in consideration that the mayor of Chicago should approve the ordinance and not return the same without his approval.

In the light of these established rules of law what is the duty of this court, even on the extreme assumption that all legal obligations to and from, or by and between, the city and the street railway properties ceased and determined on February 1, 1927, but following which date the city has proffered its consent to the further use of city streets on the same terms and conditions which the parties had agreed upon and lived up to for twenty years—this proffer being made, according to the recital contained in the first of these day-to-day permits, for the reason that "the continued unified operation of said street railways systems, under and in conformity with said Settlement Ordinances, Unification Ordinance and Operating Agreement, pending the passage of such new settlement ordinance, is desirable and necessary in the public interest and in the interests of said companies and their properties and of the City?"

To the court it seems obvious that the good-faith effort of the city to co-operate in a workable modus vivendi, pending the working out of a "new settlement ordinance," should be given co-operative support by the administrative appointees of the court, inasmuch as the court believes that such co-operation is, in the language of the above-quoted ordinance, "desirable and necessary in the public interest and in the interests of the said companies and their properties and of the City."

In connection with the fact that neither counsel for interveners nor any other person has ever suggested to the court any norm, standard, of yardstick for the measurement or ascertainment of the "fair" or "reasonable" compensation which all parties agree the city has the right to exact as compensation for the use of city streets, the following language used by the Circuit Court of Appeals of the Eighth Circuit in the case of City and County of Denver v. Stenger, 295 F. 809, 818, seems in point. In that case the receiver of the street railway system of Denver petitioned for leave to renounce the city

ordinance of 1906; and the Circuit Court of Appeals, after deciding (page 817 of 295 F.) that, in case such renunciation was allowed, the measure of the receiver's liability to the city would be "the value of the benefit such ad interim usage has been to the estate," said at page 818 of 295 F.:

"The receiver is, therefore, liable to the appellant for the value of that benefit, not exceeding the franchise requirement. What is that value in money? There neither is nor can be any market or other fixed method of determining the value of such franchise rights. It must be determined by consideration of the attendant facts. All of such facts are in this record. The ultimate reduction of these facts is that the receiver is exercising the rights to operate the only street car system existing or now having the right to exist in a growing city of 250,000 people and to be exempt from taxation for doing so. What better or fairer measure of the value of such rights could be found than the calm judgment of the parties who secured and who gave such rights, as embodied in their contract therefor? We find no difficulty in determining that the value of these benefits to the estate is that prescribed in the franchise of 1906."

For the various reasons hereinbefore set forth interveners' application that the receivers be required to cease paying 55 per cent. to the city is denied.

Second. That the amount in the renewal and depreciation fund be now applied to the payment of the first mortgage bonds.

Evidence introduced upon the hearing on June 25, 1929, shows that on May 31, 1929, the amount in such renewal and depreciation fund was $10,474,394. The record shows that by order of the Public Utilities Commission of Illinois no payments from receipts from operation of the street railways since July 1, 1920, have been made into this fund.

The reports of the receivers show that, when they took possession of the properties of the railways, the amount in this fund on December 15, 1926, was $9,521,560.72, to which the only additions have been interest on such fund and proceeds from sales of unnecessary property approved by the board of supervising engineers, and from which special fund there have been no expenditures during the receivership. This special renewal and depreciation fund was provided for and created pursuant to the following provisions of section 16 of the ordinance of 1907:

"On or before the fifth (5th) day of each and every month of each and every year that the Company continues to operate said street railway system after the expiration of said three (3) years period of 'Immediate Rehabilitation,' the Company shall deposit with one or more of the said depositaries in a separate fund, appropriately designated, a sum equal to eight (8) per cent of the gross receipts of said street railways and property for the preceding month, which shall constitute a reserve fund, for taking care of Renewals and Depreciation of said street railways and property; and out of the said fund the Board of Supervising Engineers shall from time to time authorize the payment by the Company of such amounts as are necessary to pay for renewals of the said street railways and property, the portion of said fund remaining unexpended to continue in said fund as a provision for the depreciation of said street railways and property and shall be disposed of as hereinafter provided. No payments shall be made by said Company out of said fund, except on the written certificate of the Board of Supervising Engineers, for renewals, which are hereby defined to be the replacement of any principal part of said street railways or of their equipment or appurtenances; and the Board of Supervising Engineers shall determine by classifications made from time to time what particular items of expenditure shall be considered as Renewals and what particular items of expenditure shall be considered as Maintenance and Repairs under the provisions of this ordinance.

"The whole or any portion of such reserve fund for Maintenance and Repairs may be used for maintenance and repairs in addition to the annual expenditure for Maintenance and Repairs. The fixing of the said amount herein as the minimum amount to be expended annually for Maintenance and Repairs, and the fixing of the said amount herein as the minimum amount to be deposited for Renewals and Depreciation, shall not be held or considered as lessening or limiting in any way the obligation of the Company to expend whatever sum or sums may be necessary to be expended for Maintenance and Repairs and to expend whatever sum or sums may be necessary for Renewals, to keep the said street railway system and equipment in first-class condition in every respect and at all times.

"The amounts expended or deposited respectively as reserve funds, under the foregoing provisions of this Section, shall be considered a part of the Operating Expenses of the street railway system hereby authorized, but in the event that the said street railway

system shall be purchased by the said City, or its licensee, at any time under the provisions of this ordinance, the amount then on deposit in each of said reserve funds, or due to be deposited therein at the time of such purchase, shall be turned over to and become the property of the said City or of its said licensee."

The provision for payment into said special fund was supplemented by the following provision in the operating agreement made part of the unification ordinance of November 13, 1913:

"During the period of this agreement and on or before the fifth day of each and every month of each and every year the Board of Operation shall, out of the gross receipts of the preceding month from the unified operation of the Chicago Surface Lines, deposit the amounts required for renewal and depreciation reserve fund as and for the uses and purposes specified in the Traction Ordinances, and in this ordinance, respectively.

"Sixty (60) per centum of said reserve fund shall be set aside for the renewal and depreciation of the property of the Railways Company and forty (40) per centum of said fund shall be set aside for the renewal and depreciation of the properties of the City Company, the Calumet Company and the Southern Company, to be apportioned among them as they shall hereafter agree, but such apportionment shall be subject to the approval of the Board of Supervising Engineers.

"Such accounts shall be formulated and kept during the period of this agreement as will show the amounts expended for renewals by the several and respective Companies for their several and respective properties.

"The payment from the said several funds by the several and respective companies for the renewal of their several and respective street railway properties and the control and the disposition of the portion of said funds remaining unexpended shall be governed by the provisions of the Traction Ordinances, the Unification Ordinance and this agreement. Nothing in this section contained shall be construed as curtailing in any manner the powers of the Board of Supervising Engineers with reference to the renewal and depreciation funds as stated fully in the Traction Ordinances and in this ordinance."

It will be observed that section 16 of the ordinance specifically provides that "no payments shall be made by said Company out of said Fund, except on the written certificate of the Board of Supervising Engineers, for renewals." This limitation upon the power of the street railways to use any of said fund except when authorized by certificate of the board of supervising engineers and the limitation upon the power of the board of supervising engineers to issue any such certificate except "for renewals" were recognized by the Public Utilities Commission of Illinois in its order of July 31, 1920. To prevent further accumulations in a fund which neither the street railways nor the board of supervising engineers had power to expend except for the specified purpose of "renewals," the commission, by its order of July 31, 1920, arrested the amount of depreciation currently accruing from and after July 1, 1920, diverted such depreciation from deposit in the fund controlled by the limitations thus placed upon the street railways and upon the board of supervising engineers, and ordered any surplus above expenditures for current renewals to be expended for additional equipment theretofore ordered by the commission. In this order the commission stated:

"It is the judgment of the Commission that the public interest can best be served by requiring the active employment in the public service of the amount allowed by it for current renewals and accruing depreciation; and that this will be accomplished by ordering the investment of the amount thus allowed (less expenditures for current renewals) in necessary additional equipment, rather than by permitting such amount to be deposited in an idle fund which draws only three per cent interest. The rights and interest of all parties can be protected by providing that the cost of additional equipment purchased under this order shall not be added to petitioners' investment, or to their so-called capital account or purchase price provided in the City Ordinances, unless and until they deposit in such Renewal and Depreciation Fund the amounts which may be expended under this order for additional equipment."

It will be further observed that said section 16 of the 1907 Ordinance also provides that, "in the event that the said street railway system shall be purchased by the said City, or its licensee, at any time under the provisions of this ordinance, the amount then on deposit in each of said reserve funds, or due to be deposited therein at the time of such purchase, shall be turned over to and become the property of the said City or its said licensee."

Based in part upon the last-quoted provision of section 16 the city has prosecuted

an appeal from that part of the decree of July 18, 1928, which holds that the special fund for renewals and depreciation is subject to the lien of the several mortgages. At the time of the entry of this decree, the court concurred in that part of the argument made on behalf of the city which urged that this special fund was in the general nature of a trust fund which constituted an integral part of the "going concern" described in section 23 as "the said street railway system," comprised in part of street railway physical properties and in part of money set aside as such properties wore out through use in an amount equivalent to such wear, and for the specific and sole use of replacing or renewing such physical properties at the end of their useful lives, in order (as stated in section 16 of the ordinance creating such fund) "to keep the said street railway system and equipment in first-class condition in every respect and at all times."

But the court could not concur in the further argument of counsel for the city that acceptance of the view that this reserve fund for renewals and depreciation was in the general nature of a trust fund, in the sense that it could not be distributed or dissipated without destroying the "rights of the Company in case the City does not purchase for twenty years" enumerated in section 23 of the ordinance, was in any manner inconsistent with the finding of the decree that the mortgagees had a lien upon this fund—especially when one subdivision of the decree specifically showed "decree without prejudice to any right of the City to purchase or to grant a license to another Company to purchase."

Obviously, with the appeal of the city now pending in the Circuit Court of Appeals wherein the city is claiming that this court erred in holding that this fund was subject to the lien of the mortgages, this court could not with propriety order that the fund "be applied to the First Mortgage" as asked by interveners, and thus defeat by indirection any relief to the city in case the Circuit Court of Appeals should find that this court erred in the entry of the decree of July 18, 1928. However, the court does not wish to base the denial of interveners' application to distribute the renewal and depreciation fund solely on the ground of the pendency of the city's appeal, in view of the suggestion of counsel for interveners that the city's "appeal does not reach the question on the remedy that interveners are seeking," and in view of the further suggestion that the postponement by this court of decision on interveners' motion until the Circuit Court of Appeals has decided the city's appeal might prejudicially affect the presentation of the views of counsel for interveners to the Circuit Court of Appeals. Accordingly, the court has considered said application on its merits; and, for the reasons fully stated in denying interveners' application that the receivers be required to cease paying the 55 per cent. to the city, has reached the following conclusions:

(1) The Mueller Law authorized, and section 23 of the ordinance of 1907 constituted, a valid contract, between the city and the street railway company, binding upon the city in the provision that in case "the City shall grant a right to another company to operate a street railway in the streets and parts of streets constituting the said street railway system of the Company such new company shall be required to and shall purchase and take over the said street railways, property and rights of the Company at or after February 1, A. D. 1927, upon the same terms upon which the City might then purchase and take them over."

(2) In the judgment of the court this obligation of the city is a valuable right which ought not to be surrendered through a merely administrative order in advance of the time when, if ever, it shall become apparent that the court has no alternative except to wind up the affairs of Chicago Railways Company by the disintegration of the physical properties and the special funds which together constitute "the said street railway system" covered by said section 23.

(3) To preserve, as an obligation of the city, the above-quoted provision of section 23 inherently implies a preservation by this court of "the said street railway system" to which the city owes such obligation; and, as above pointed out, the fund for renewals and depreciation which interveners seek to have distributed in just as much a part of "the said street railway system" to which the city's obligation runs as are the physical properties of said system.

Accordingly, interveners' application that the special renewal and depreciation fund be now applied to the first mortgage is denied.

Third. That a valuation be put upon the properties for the purposes of reorganization.

During the course of the argument, it was suggested that the receivers cause to be brought down to date the additions made to capital account since the date of the valuations made in the order entered by the Public Utilities Commission of Illinois on November

5, 1920, which order is referred to and quoted from in the petitions filed by interveners; and counsel for interveners indicated that, if this was done, then he had nothing to suggest to supplement such proceedings, at this time, under his motion.

The excerpts from the order of the Public Utilities Commission contained in the petitions filed by interveners show that the valuations made by the Public Utilities Commission in its order of November 5, 1920, were based upon an inventory of the properties as of January 31, 1919. The receivers are directed to obtain from the board of supervising engineers statement showing the net additions after January 31, 1919, to February 1, 1929, to the capital accounts of the several street railway properties which are included in the valuation made in the order of the Public Utilities Commission of Illinois entered November 5, 1920; and to file in this proceeding the statement so obtained from said board of supervising engineers and also to file herein a copy of said order entered by the said Public Utilities Commission of Illinois on November 5, 1920.

Application of Harris Trust & Savings Bank for payment of 10 per cent. on the principal due on the first mortgage bonds.

In support of this application, evidence was introduced which showed that on May 31, 1929, the receivers had on hand (subject to payments therefrom on August 1, 1929, to Harris Trust & Savings Bank, of the sums of $1,391,375 and $27,827.50 in accordance with the decree of July 18, 1928) over $7,-500,000 separate from special accounts such as the renewal and depreciation fund and the special renewal and equipment fund, which was required by order of the Public Utilities Commission.

Earnings from operation since the receivers were appointed have at all times been more than the currently accruing interest on all bonds plus the currently accruing compensation exacted by the city for the use of city streets. No interest has been paid on any of the junior bonds since February 1, 1927, and the interest which will have accrued from February 1, 1927, to August 1, 1929, on the amount of such outstanding junior bonds, as fixed by the decree of July 18, 1928, is approximately $5,000,000, and 10 per cent. on the first mortgage bonds is $5,565,500. Trustees in the mortgages securing the junior bonds have made diligent efforts to persuade the court that it had power to order interest paid upon these junior bonds, but the court

felt constrained to hold (decree of July 18, 1928) that:

"No payment, either of interest or principal, or any other right under the Consolidated Mortgage, the Purchase Money Mortgage or the Adjustment Mortgage, or the bonds secured thereby, is to be made by the Receivers out of any properties or funds belonging to Chicago Railways Company until the full amount of the principal and interest due upon all of the outstanding bonds under the First Mortgage is paid, together with all of the Trustees' fees, expenses and liabilities of every kind, and also until there has been paid to Westinghouse Electric & Manufacturing Company the sum of Sixty-seven Thousand and Seventy-Five Dollars ($67,-075.00), found by this decree to be due to it, together with any unpaid interest thereon at the rate of five per cent. (5%) per annum from December 15, 1926 until payment is made."

The draft order submitted by counsel for Harris Trust & Savings Bank, at the beginning of the arguments, has noted thereon the approval of the solicitors for the trustees of all the junior mortgages, for the city and for Westinghouse Electric & Manufacturing Company, whose claim was adjudicated by the decree of July 18, 1928, to be superior to the junior mortgages and to be on a parity with the first mortgage bonds, and upon whose claim the order submitted provides that the receivers shall pay the same percentage of principal as is to be paid on the principal of the first mortgage bonds.

The evidence shows that the payments ordered by the draft submitted can be made without impairment of the ability of the receivers to carry out the directions heretofore given for the purchase of sixty additional cars, or for the payment to the city of compensation for the use of city streets, or for other administrative requirements to preserve the integrity of the street railway system. Obviously, the reduction of the amount of the indebtedness which is drawing 5 per cent. interest is to the ultimate benefit and advantage of all interests in the property which are subordinate to the indebtedness thus reduced. Therefore the court has this day signed the order in the draft form submitted by counsel for Harris Trust & Savings Bank, but, in accordance with the request of counsel for interveners that, in case such order was entered, he desired that it be made over his objection, the court has interlined, after the first three words on the sixth

line of the draft, the words "and counsel appearing on behalf of Orville E. Babcock et al., having objected to the entry of this order."

The three grounds of relief requested by interveners may be covered by separate order consistent with the conclusions stated herein, drafts of such order to be submitted to the court on July 18, 1929, at 10 a. m. Such order may provide, if counsel for interveners so desires, that it is made without prejudice to the right of interveners, upon notice to all parties, to have set down for hearing any evidence which interveners desire to offer with reference to the value of the properties of Chicago Railways Company.